## CHEVY CHASE VILLAGE, ET AL. *v.* MONTGOMERY COUNTY COUNCIL, ET AL.

[No. 369, September Term, 1969.]

*Decided May 6, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SMITH, and DIGGES, JJ.

*Rourke J. Sheehan,* with whom were *Arthur G. Lambert* and *Robert L. Higgins* on the brief, for appellants.

*H. Christopher Malone, Assistant County Attorney,* with whom were *David L. Cahoon, County Attorney,* and *Alfred H. Carter, Deputy County Attorney,* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

The two principal questions involved in this zoning appeal are whether or not the Circuit Court for Montgomery County (Shure, J.) erred by passing its order of November 10, 1969, affirming the order of February 25, 1969, of the Montgomery County Council, sitting as the District Council for the Maryland-Washington Regional District in Montgomery County (District Council), affirming a reclassification of 82,500 square feet of land located on the north side of Western Avenue and Kirkside

Drive in Chevy Chase, Montgomery County, from the R-60 (one-family, detached residential) zone to the R-150 (density control development, one-family, detached, restricted residential, average lot size) zone upon the application of the contract purchasers of the land, W. R. Frank Hines and Michael J. Rinaldi, two of the appellees, because (1) the District Council in its opinion failed to set forth any conclusions or reasons in regard to either mistake in original zoning or change in the character of the neighborhood and (2) the evidence before the Board did not establish that any mistake in original zoning or change in the character of the neighborhood had occurred.

The subject property, as indicated, contains 82,500 square feet of unimproved land. It is rectangular in shape and located on the north side of Western Avenue between Wisconsin Avenue, Kirkside Drive and Grove Street in Chevy Chase. There is frontage on both Western Avenue and Grove Street which is parallel to Western Avenue on the north side of the property. Immediately adjoining the property to the northeast is the Church of Jesus Christ of Latter Day Saints erected in 1955. The church parking lot is located on the Grove Street side of the property. Adjoining the subject property on the southwest is the off-street parking lot for the Chevy Chase Shopping Center, beyond which is the shopping center, itself, in a C-2 (general commercial) zone. To the south, across Western Avenue, in the District of Columbia and opposite the subject property, is the Lisner Home, a home for retired ladies. South of the Lisner Home is the Washington Medical Clinic and to the north is the Chevy Chase Playground. To the south of the Washington Medical Clinic are single-family residential dwellings under the jurisdiction of the Government of the District of Columbia. To the north and northeast of the subject property is an area of well-maintained, single-family homes developed in the R-60 zone.

The area of the intersection of Wisconsin Avenue and Western Avenue is a major commercial center occupied not only by the shopping center but also by Saks Fifth

Avenue, Raleigh Haberdasher, Woodward & Lothrop, Lord and Taylor and others. The Barlow Office Building, the Highland House and the Willoughby and Irene Apartment Hotels lie to the northwest of the commercial center (zoned C-2) at this intersection. The commercial shopping area is buffered from the residential uses to the northeast by the off-street parking lots which operate as special exceptions in the R-60 zone. The shopping center's off-street parking lot, which adjoins the subject property on the west side, is separated from it by a retaining wall and screen planting. There is a substantial change in grade between the parking lot and the subject property ranging from two feet at Western Avenue to 16 feet at the rear portion of the subject property adjacent or in close proximity to Grove Street.

The applicants admitted at the hearing before the hearing examiner—and it is conceded in the case — that if their application for the R-150 zoning were to be granted, they intended to petition the Board for a special exception for a funeral home. Although the single-family residential uses permitted in an R-60 and an R-150 zone are the same, funeral homes and riding stables are permitted as special exceptions in the R-150 zone but are not permitted in the R-60 zone.

A. Morton Thomas, Jr., a qualified land planning expert, testified for the applicants that the R-150 zone would be compatible with the area, would complement the existing uses and would not damage the existing development of surrounding properties. He testified that the "down zoning" of the subject property from R-60 to the R-150 zone would reduce the potential single-family building lots from ten to four and, in his opinion, the rezoning to the R-150 zone was justified because property had been developed and assembled in large tracts up and down on both sides of Western Avenue. He concurred with the conclusion of the Technical Staff of the Maryland-National Capital Park and Planning Commission (Planning Commission) that the requested C-1 (local commercial) zoning would not be compatible with the de-

velopment in the area, but that the requested R-150 zoning would be compatible. Mr. Thomas was also of the opinion that if and when the applicants applied for a permit to use the subject property as a funeral home as a special exception, such a use would not be injurious to the surrounding and neighboring properties, but, on the contrary, would be an appropriate use for the subject property as a "problem piece of property."

James M. Hunnicutt, a qualified traffic and parking expert testified that there would be no traffic problem if the rezoning to an R-150 zone were granted or if ultimately a special exception for a funeral home use were granted. He stated facts and reasons sustaining his opinion.

W. R. Frank Hines, one of the applicants, testified that for 52 years he has been a licensed funeral director in the District of Columbia at 14th Street and Harvard Street. As a result of the deterioration of that neighborhood and the riots in April 1968, he testified that his clients were afraid to go to his District of Columbia establishment. He has been operating his business at a loss and must remove his business from the District of Columbia. Michael J. Rinaldi, the other applicant, is also a licensed funeral director in the District of Columbia. He testified that he operated his business at 7400 Georgia Avenue, N.W., some two blocks north of Walter Reed Hospital. Although the conditions surrounding his location are not as aggravated as those surrounding the location of Mr. Hines, there have been "a number of problems" in the surrounding area that require him to remove his business from the District of Columbia. He estimated that 60% of his business came from residents of Maryland. Both Mr. Hines and Mr. Rinaldi testified in regard to their efforts to locate suitable sites for their business in Maryland. Both agreed that the subject property was ideal for this purpose, would not injure the surrounding properties in anyway, create any traffic or other hazards, and that the proposed funeral home would be a modern, well-located, well-operated and screened established.

The applicants' architect, Marvin J. Cantor, practicing

in both the District of Columbia and Maryland, had prepared plans showing the location and nature of the proposed funeral home on the subject property. These plans were introduced into evidence before the hearing examiner, showing that the structure would cover approximately 8,000 square feet (of the entire 82,500 square feet), that the porte-cochere would set back some 75 feet and the main building some 100 feet from the property line on Western Avenue. The rear set back is almost 90 feet from the property lines. There would be 155 or 158 parking spaces, more than sufficient to meet code requirements and more than ample to meet all practical needs. The only entrances and exits would be on Western Avenue. The proposed funeral home is shown as well screened and planted; the applicants "expect to save virtually every tree intact on both side lot lines."

For the protestants, Algernon S. Gardner, Jr., a qualified real estate broker and expert, was of the opinion that a funeral home in the location would "be an intrusion" into a high class residential neighborhood in which homes were selling from $52,000 to $73,000. He admitted, however, that if the funeral home could not be seen from Grove Street, it would have no effect upon the residential properties and that the church would buffer the homes on Western Avenue from the subject property.

James D. Pammel, a real estate expert from Virginia, also testified for the protestants. It was his opinion that the proposed R-150 zone was not appropriate for the subject property, pointing out that on all sides of the property within Montgomery County the zoning was R-60 and that across Western Avenue in the District of Columbia the zoning was R-2 (single-family residential detached housing). He also observed that the subject property had been zoned R-60 in the comprehensive zoning in 1954; and that prior to that for many years it had been zoned R-A, a comparable zone to the R-60 zone. He also pointed out that in 1955 the District Council had declined to rezone the subject property from R-60 to C-1, observing that the proposed reclassification to a commercial use

would be an unwarranted intrusion into an area composed mainly of single-family residences; and, further that in 1960 the District Council had declined to permit funeral home uses in intense residential zones in Montgomery County, including the R-60 zone. In his opinion a funeral home use was essentially a commercial use which would have a depressing effect upon the surrounding residential users.

Two nearby residents in the area, George Collins and Dr. Hewitt Varney, also testified in opposition to the granting of the application. It is uncontested that they had status to challenge the granting of the application as "parties aggrieved" in view of the location of their properties. They stated their reasons for the opposition, principally directed at any funeral home use, and why the proposed use would depreciate the value of their properties.

Both the Technical Staff and the Montgomery County Planning Board (the Planning Board) of the Planning Commission pointed out that the requested rezoning does not conform to the zoning and highway plan for "West Chevy Chase and Vicinity," adopted February 5, 1964, as amended; that the present R-60 zoning had been in effect since the 1954 Comprehensive Zoning Ordinance; that prior to that ordinance the land had been zoned Residential "A", and, that the present application was the fourth request for more intensive use of the subject property than the R-60 zone permits. Both the Technical Staff and the Planning Board, however, recommended denial of the requested C-1 zoning, but recommended that the District Council grant the R-150 zoning alternatively. The Technical Staff and the Board were of the opinion that the rezoning to R-150 and the ultimate granting of a special exception for a funeral home would solve a difficult land use problem for the undeveloped subject property in that (1) such a use was compatible with the surrounding area; (2) would stabilize the neighborhood and act as a transitional area between the commercial and the residential areas; and (3) if the subject property were not used for

a funeral home, the R-150 zone only permitted as a right the same type of residential use as was permitted in the R-60 zone. It is significant to observe that neither the Technical Staff nor the Planning Board were of the opinion or found that there had been any mistake in original zoning or any change in conditions which changed the character of the neighborhood justifying the recommended rezoning to R-150. In so far as the requested C-1 rezoning was concerned, they stated that this should be denied because "an effective termination of the commercial area has been established, and * * * *there has been insufficient change in the surrounding area to allow further encroachment of commercial zoning into the single-family neighborhood to the northeast.*" (Emphasis supplied.)

The Hearing Examiner, Charles G. Dalrymple, in a comprehensive and well-considered opinion, filed December 12, 1968, recommended that the application be denied for both C-1 and R-150 rezoning. After reviewing the above-mentioned facts in detail, he observed the previous action of the District Council in permitting funeral homes as special exceptions in the R-A, R-R and R-150 zones, but declining to permit the same use in the R-60 and R-90 zones on the basis of density of development. He was of the opinion that "to grant this application for the R-150 zone would be providing indirectly that which the [District] Council declined to provide when it refused to amend the Ordinance to include funeral parlors as a special exception in the R-60 areas." His conclusions were:

"1. There has been no change in the character of the surrounding neighborhood to the extent necessary to justify either the C-1 or the R-150 zoning of the subject property.

"2. The granting of either of the requested reclassifications would be contrary to the existing zoning in the area and the recommended zoning for the West Chevy Chase Planning Area.

"3. The subject property lies within an R-60 type community and thus is inappropriate even for consideration to rezoning to a classification which would permit the filing of a special exception for a use which was precluded in the R-60 zone by the District Council under Application No. C-1235."

The District Council after considering the Hearing Examiner's Report remanded the case to him to supplement his Report in order "to more fully acquaint the [District] Council with the testimony relating to the impact of funeral homes on residential life. . ." Thereafter, on February 13, 1969, the Hearing Examiner filed his Supplemental Report and Recommendations reviewing the evidence on the subject matter of the referral, but made no attempt "to evaluate the evidence to determine whether, in fact, a funeral home on the subject property would be compatible with the surrounding development or would have an adverse impact thereon." He indicated that the latter evaluation was more properly the function of the County Board of Appeals. The Hearing Examiner, however, reaffirmed his conclusions in the original Report that "the neighborhood in which the subject property is located is an R-60 type neighborhood and no change in character or mistake has been demonstrated to warrant either of the requested reclassifications."

The District Council on February 25, 1969, by a vote of four to three, disagreed with the Hearing Examiner. It adopted a resolution granting the requested rezoning to R-150 and denying it for the C-1 zone. The majority of the District Council adopted in substance the reasoning of the Technical Staff and Planning Board and stated in relevant part:

"Without attempting to determine the suitability of a funeral home at this location, that being a function of our Board of Appeals, the Council concludes that the subject property lies in an area where the pattern of development has

been on tracts larger than normally associated with R-60 zoning. The use proposed appears to be compatible with the surrounding area, in that it lies near a major concentration of C-2 zoning at the intersection of Wisconsin and Western Avenues, directly to the northeast of the subject property there is presently the Church of the Latter Day Saints and its parking area, directly to the southwest there being the Chevy Chase shopping center and its parking lot, to the southeast and across Western Avenue we find the Lisner Home for the elderly and the Washington Medical Clinic, and on the north side of Grove Street, opposite the subject tract are four R-60 lots resubdivided into two 10,000 square foot lots and one 8,750 square foot lot. This application is consistent with the pattern of development in this area on tracts larger than those normally associated with the R-60 zone and affords the applicant an opportunity to utilize the subject tract in a manner consistent with the development of the surrounding area.

"The Council further finds that the reclassification to the R-150 zone would not adversely affect single family development to the north but rather such use would stabilize the neighborhood and would act as a transition between the commercial area to the west and the single family areas to the north and east of the subject tract. The total impact upon these single family areas would not appear to be any greater than that resulting from the Church established on the adjoining tract.

"The action of this Council in granting reclassification from the R-60 to the R-150 zone represents a down zoning of this tract to a less dense land use classification fully compatible with the R-60 zone. This action is consistent with prior Council action on a similar applica-

tion, involving similar circumstances, E-668, in the Wheaton area, on September 6, 1966, but should not be construed as negating the intent of the Zoning Ordinance to maintain and permit funeral homes as special exceptions only in the C-O, C-1, R-A, R-R, and R-150 zones, separate and apart from those residential zones which are theoretically and factually more dense in nature."

It is significant to observe that the District Council makes no attempt in its opinion to find that there had been any original mistake in the comprehensive zoning or that there had been any change in conditions changing the character of the neighborhood sufficient to justify the granted rezoning.

A timely appeal from the District Council resolution and order of February 25, 1969, granting the application for R-150 rezoning was timely perfected to the Circuit Court for Montgomery County. After a hearing, Judge Shure was of the opinion that the "case was fairly debatable and thoroughly considered before a decision was reached" and on November 10, 1969, passed an order affirming the decision of the District Council. In his opinion, Judge Shure stated:

"Without reviewing the testimony in detail, it is sufficient to say that the neighborhood has changed in character over the recent years and there now exists in the area, which was formerly residential, a 14 story apartment hotel, Saks Fifth Avenue Department Store, gasoline filling stations, the said large Chevy Chase Shopping Center and the District of Columbia Medical Clinic. To the west, at the corner of Western Avenue and Wisconsin Avenue, and immediately across from the Chevy Chase Shopping Center, is a Woodward and Lothrop Department Store. Beyond is the Government Employees Insurance Company complex, and across the street

therefrom, the Lord and Taylor Department Store.

"As was pointed out in the County's brief, the County Council has previously granted a reclassification in a case entirely on point, on September 6, 1966 (Zoning Application No. E-668, reclassifying property from R-60 to the R-150 Zone). The applicant there had indicated an intention to petition for a special exception for a funeral home. With respect to the change of the character of the neighborhood, the Montgomery County case of Somerset v. County Council (229 Md. 42) is important. The same changes that were found in that case support the rezoning here. With respect to changes in the area generally, see also Marcus v. Montgomery County (235 Md. 535) and Muhly v. County Council (218 Md. 543).

A timely appeal to this Court was taken from the Order of November 10, 1969.

In our opinion, the lower court erred in affirming the decision of the District Council in that (1) the opinion of the District Council failed to comply with the mandatory requirements of the Zoning Ordinance to set forth "its reasons and conclusions" of any mistake or change in conditions changing the character of the neighborhood and (2) in any event, there was no sufficient evidence in the case indicating any such mistake or change in conditions. We shall, therefore, reverse the order of November 10, 1969.

### (1)

Section 111-49 (a) of the Montgomery County Code, 1965, requires that any resolution adopted by the District Council in rezoning matters "*shall* be accompanied by an opinion of the district council setting forth its conclusions and reasons. . . ." (Emphasis supplied.) This mandatory requirement is quite similar to the requirement in the Prince George's County Code which provides:

"59-104. In Prince George's County, no application for a map amendment or special exception, which is contested, shall be granted or denied except upon *written findings of basic facts and written conclusions.*" (Emphasis supplied.)

We had this Prince George's County provision before us in the recent case, *Montgomery v. Board of County Commissioners for Prince George's County*, 256 Md. 597, 261 A. 2d 447 (1970), in which we reversed an order of the lower court in affirming an order of the Board of County Commissioners, sitting as a District Council, and remanded the case so that it should comply with this mandatory requirement. In *Montgomery,* we stated:

"It is clear from our prior decisions that in order to sustain a rezoning different from the zone established in the comprehensive zoning map, it must be established that there was either a mistake in the original zoning or a change in conditions which has resulted in a change in the character of the neighborhood. *Wells v. Pierpont,* 253 Md. 554, 557, 253 A.2d 749, 751 (1969) and prior Maryland cases therein cited.

"Inasmuch as there is no contention in the present case that there was a mistake in the original zoning, it was necessary that the applicants establish before the District Council (a) what area reasonably constituted the 'neighborhood' of the subject property, (b) the changes which have occurred in that neighborhood since the comprehensive rezoning and (c) that these changes resulted in a change in the character of the neighborhood. These are the 'basic facts' and 'conclusions' which the District Council must find and express in writing when it grants or denies a map amendment or special exception.

"As we have indicated, the comprehensive rezoning occurred in 1957; the subject property

was then zoned R-R; and, the applicants sought a map amendment to a commercial zone. The 'change-mistake' rule was, therefore, applicable as no 'floating zone' is involved and the District Council *was required* by the statute to make the necessary findings and conclusions and to express them in writing. It is apparent that the District Council did not do this and we have no alternative but to reverse the order of the trial court and remand the case so that it may be remanded to the District Council for compliance with the mandatory requirement of the statute." (*Montgomery, supra,* 256 Md. at 602-03, 261 A. 2d at 450.)

In our opinion, the *Montgomery* case is controlling on this point in the present case. In the instant case as in *Montgomery,* there is no contention that there was a mistake in original zoning, so that, under our prior decisions, it was essential that the District Council set forth its "conclusions and reasons" with regard to the three elements in the "change in conditions" portion of the "change-mistake" rule, as stated in *Montgomery*. This it failed to do, even though the Hearing Examiner *twice* referred to the failure of the evidence, in his opinion, to show any change in conditions sufficient to justify the requested rezoning.

Ordinarily, as we did in *Montgomery,* we would reverse and remand the case to the lower court for further remand to the District Council to make the necessary written findings of basic facts and conclusions from the evidence; but in the present case, this would be fruitless inasmuch as we have concluded that the finding of the Hearing Examiner was correct and that there was no evidence of a change in conditions changing the character of the neighborhood sufficient to justify the requested rezoning of either C-1 or R-150. We now turn to a consideration of this conclusion.

### (2)

Although neither the Technical Staff, the Planning Board nor the District Council made any finding that the neighborhood had changed in character, the lower court, as we have seen, attempted to make such a finding. Judge Shure stated that the "neighborhood has changed in character *over the recent years*" and that there *"now* exists in the area, which was formerly residential, a 14 story apartment hotel, Sacks [sic] Fifth Avenue Department Store, gasoline filling stations, the said large Chevy Chase Shopping Center and the District of Columbia Medical Clinic." He observed that immediately across from the shopping center is a Woodward and Lothrop Department Store and beyond is the Government Employees Insurance Company complex. Across the street from that complex is the Lord and Taylor Department Store.

The fact remains, however, that the District Council made no such finding and as we said in *Montgomery*:

> "* * * it is clear to us that the District Council, itself, must make the written findings of the basic facts and the written conclusions in order to comply with the statutory requirement in this regard. This cannot be done by the Circuit Court or by us on appeal."
> (256 Md. at 604, 261 A. 2d at 451.)

What can be determined by the Circuit Court and by us on appeal, however, is whether or not there was any evidence before the District Council sufficient to enable it to find that the necessary changes in the character of the neighborhood had occurred. *Wells v. Pierpont,* 253 Md. 554, 253 A. 2d 749 (1969) and prior cases cited in the opinion in that case. As we stated in *Smith v. Board of County Commissioners of Howard County,* 252 Md. 280, 283-284, 249 A. 2d 708, 710 (1969) :

> "On innumerable occasions, this Court has held that *'there is a strong presumption of the correctness of original zoning and of comprehensive rezoning, and that to sustain a piece-*

*meal change therefrom, there must be strong evidence of mistake in the original zoning or in the comprehensive rezoning or else a substantial change in conditions.' France v. Shapiro,* 248 Md. 335, 342, 236 A.2d 726, 730, citing *Greenblatt v. Toney Schloss,* 235 Md. 9, 200 A.2d 70, citing *Shadynook Imp. Assn. v. Molloy,* 232 Md. 265, 192 A.2d 502 and cases there cited. We have further stated that where the Board's decision is supported by substantial evidence and the issue before it is 'fairly debatable' that the courts may not substitute their judgment for that of the Board. *Scull v. Coleman,* 251 Md. 6, 246 A.2d 223; *Ark Readi-Mix v. Smith,* 251 Md. 1, 246 A.2d 220; *Bosley v. Hospital,* 246 Md. 197, 227 A.2d 746. *However, if the record is so devoid of substantial supporting facts as to be incapable of raising a debatable issue a court will declare the legislative or administrative action invalid. France v. Shapiro, supra; Baker v. Montgomery County,* 241 Md. 178, 215 A. 2d 831; *Stockdale v. Barnard,* 239 Md. 541, 212 A. 2d 282." (Emphasis supplied.)

The burden of proof is upon the applicant seeking a zoning reclassification to establish all of the elements of his case. *Agneslane, Inc. v. Lucas,* 247 Md. 612, 618, 233 A.2d 757, 760 (1967). Here, the applicant failed to establish the three essential elements already mentioned. First, the experts for the applicants did not by their testimony define what, in their opinion, constituted the "neighborhood" of the subject property. Second, there was no testimony indicating that any changes took place in the "neighborhood" subsequent to the comprehensive rezoning in 1954. Third, there was no evidence that any changes in the "neighborhood" resulted in a change in its character.

Mr. Thomas relied on four alleged "changes": Chevy Chase Shopping Center, the Saks Fifth Avenue Store, the Church of the Latter Day Saints and the Lisner Home.

Even if we assume for the argument that these four "changes" are in the "neighborhood" of the subject property, the evidence indicates that they existed prior to the 1954 comprehensive rezoning.

In regard to the shopping center, Mr. Wohlfarth, the owner of the subject property who sold it conditionally to the applicants, testified that it existed in 1952. Mr. Thomas admitted in his testimony that it had been built prior to the comprehensive rezoning of 1954.

As to Saks Fifth Avenue, Mr. Thomas did not know when it was erected, but admitted that it was about two blocks away. The aerial photograph, introduced into evidence, indicates that it is at least two blocks away and is separated from the subject property by attractive single-family homes in Chevy Chase.

In regard to the church, Mr. Thomas conceded that it was a permitted use in a residential zone and was, therefore, not a "change" justifying the rezoning application.

Finally, in regard to the Lisner Home, Mr. Thomas admitted that it had been across the street from the subject property "for many years" and another witness testified that it had been there since the early 1940's.

The applicants failed to show *any* change which had occurred since the last comprehensive rezoning in 1954 which changed the character of the "neighborhood" and, as we have indicated, did not even delineate what the "neighborhood" was. However, they earnestly urge upon us that the District Council could consider changes which occurred *prior* to the comprehensive rezoning in 1954, relying upon our decision in *Town of Somerset v. County Council for Montgomery County,* 229 Md. 42, 181 A. 2d 671 (1962) and cases therein cited. It is quite correct, as argued by the applicants, that if there have been changes in the neighborhood since the comprehensive rezoning, the District Council may consider changes prior to the comprehensive rezoning to determine whether or not it will grant the application.

But, the District Council may only consider the changes *prior* to the comprehensive rezoning in reaching its de-

cision in regard to the significance of the subsequent change in the neighborhood and whether or not it would be in the public interest to grant the proposed rezoning. Where, however, there has been *no* change at all established since the last comprehensive rezoning, as in the present case, then it must be assumed that the legislative body, with the prior changes before it, confirmed the existing zoning notwithstanding such prior changes, when it adopted the new comprehensive rezoning ordinance retaining the existing zoning classification.

There may indeed be much to be said for the observations of the Technical Staff, the Planning Board, the District Council and the lower court in regard to the desirability of stabilizing the use of the subject property—as a problem piece of property—by permitting the funeral home use and erection of the attractive funeral home, properly screened, and operated as outlined in the testimony. It could be that the protestants would have been well advised not to have objected to the granting of the application for the R-150 rezoning, but these are matters which are not before us and for which we have no responsibility. Our function and that of the lower court is to apply the "change-mistake" rule in accordance with our prior decisions.

For these reasons we conclude that the Hearing Examiner was correct in finding that there had been no changes in the neighborhood of the subject property which changed the character of that neighborhood and it would be fruitless to remand the case to the District Council under these circumstances.

> *Order of November 10, 1969, affirming the order of the District Council of February 25, 1969, reversed, and the case is remanded to the Lower Court with directions to enter an order reversing the order of the District Council of February 25, 1969, the appellees to pay the costs.*