## REDDEN ET AL. *v.* MONTGOMERY COUNTY, MARYLAND ET AL.

[No. 145, September Term, 1973.]

*Decided January 4, 1974.*

*Motion for rehearing filed February 4, 1974; denied February 25, 1974.*

The cause was argued before BARNES, McWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*William S. Green* for appellants.

*Richard M. Millman,* with whom was *Harvey B. Bolton,*

*Jr.*, on the brief, for National Council of Senior Citizens, Inc., part of appellees. *John B. Walsh, Jr., Assistant County Attorney*, with whom were *Richard S. McKernon, County Attorney*, and *Stephen P. Johnson, Assistant County Attorney*, on the brief, for Montgomery County Board of Appeals, other appellee.

BARNES, J., delivered the opinion of the Court.

The land involved in this appeal contains approximately 12 acres. It is located on the south side of MacArthur Boulevard between Cabin John Gardens, Inc. and 78th Street in Cabin John, Montgomery County (the subject property). It is in the R-90 zone — one family, detached residential. *See Polinger v. Briefs*, 244 Md. 538, 224 A. 2d 460 (1966); *Redden v. Montgomery County*, 265 Md. 567, 290 A. 2d 494 (1972); and, *Maryland-National Capital Park & Planning Commission v. Montgomery County*, 267 Md. 82, 296 A. 2d 692 (1972).

The present case involves a special exception granted by the County Board of Appeals for Montgomery County (the Board) by a three to two vote, on June 1, 1971, to the National Council of Senior Citizens and Cabin John Associates, two of the appellees, for the erection of a brick, "4-arm" building containing 334 efficiency units and 94 one-bedroom apartments for the housing of elderly and handicapped persons on the subject property. The appellants, Isabelle L. Redden and others, perfected an appeal from the Board's decision to the Circuit Court for Montgomery County. That court (Moorman, J.) affirmed the action of the Board by an order passed on May 25, 1973. From this order, the appellants perfected a timely appeal to this Court.

The record in the present case is a substantial one. It consists of some 467 pages of testimony taken at three hearings before the Board and a substantial number of documentary exhibits. The National Council of Senior Citizens (National Council) presented several expert and lay witnesses in support of the application for the special exception.

William R. Hutton, the Executive Director of the National Council, described the National Council as a nonprofit, nonpartisan organization of older citizens promoting positive programs, looking toward a better life for all Americans. He described the desperate need for housing for older citizens and emphasized the critical need for this type of housing in Montgomery County. He testified that the two existing housing projects in Montgomery County for the moderate income elderly citizens were fully occupied and that there was a waiting list of "well over 500 elderly couples and individuals for any vacancy arising in these units." He also testified that another housing development in Montgomery County has some 274 units and that these units are 100% occupied with 111 applicants on a waiting list for vacancies in that housing development.

Mr. Hutton testified further that the proposed project would be for persons aged 62 or over, and for couples, one of which is 62 years of age or older, and also for the ambulatory, but otherwise handicapped persons over 55 years old. He stated that these future residents would be alert, able-bodied, and self-supporting; less than one in five of these future residents would operate automobiles. They would not burden the traffic pattern in southern Montgomery County. It was anticipated that many of the future residents would be offered the opportunity to be employed in the operation of the proposed project itself. He stated that the National Council would be "fully and solely responsible" for the project, which would be financed by the United States Department of Housing and Urban Development (HUD) under Section 236 of the Federal Housing Act. In Mr. Hutton's opinion, the proposed project would not interfere with the pattern of living in the Cabin John community.

William Beechhill, a former United States Commissioner on Aging, testified in support of the application. He is presently a member of the faculty of the School of Social Work and Community Planning at the University of Maryland. He described the National Council as having high integrity and character. He also testified that he and Dr. Robert Lansdale were conducting a state-wide study of the

needs of older persons in Maryland and that there was a great need in Montgomery County for housing for elderly persons.

Frank G. Zelenka, Associate Director of the American Association of Homes for the Aging, testified in regard to the need for housing for the elderly. He indicated that the existing centers of housing for the elderly in Montgomery County had a total of 801 units, all of which were occupied, with a combined waiting list of over 1,000 persons.

The architect who designed the proposed structure, Jesse Weinstein, testifying for the applicants, stated that the building had been deliberately spread out and kept low in order to avoid the impact from the palisades from the Potomac River below and from the Virginia side of the river. In order to preserve the aesthetic surroundings, he stated that the design had been made so as to retain the belt of existing trees around the building except for the entrance to it. He further testified that the unit's density was in conformance with the requirements of the Montgomery County Code that there be one unit for each 750 square feet; indeed, there would be less units than those allowable under that code. He indicated that the proposed project does not exceed the maximum coverage permitted in the R-90 zone, does not exceed the height requirement for a residence, and meets the automobile off-street parking requirements of the code, as well as all required setback requirements of that code. In his opinion, the proposed structure would be a compatible type of architecture and "perhaps a little better than what is around there." The elderly residents of the proposed structure would have less impact on the schools than if the property were developed with single-family homes.

Dr. Malcolm Rivkin, a former member of the Montgomery County Planning Board and a professional city and regional planner, whose qualifications as a planning expert were conceded, testified that the proposed project would, in his opinion, be in accordance with the intent of the master plan for Montgomery County. In his opinion, the plan for the proposed development of the subject property was in

keeping with the scenic and open character of the Potomac palisades more so than any R-60 or R-90 development — cluster or otherwise — would be which might develop on the site. He observed that the master plan provided that low and moderate income housing be considered for the general area and that, in his opinion, it would be impossible under any available construction financing and under any economic conditions to construct low and moderate housing on a single-family basis. He stated further that the proposed project "is more in keeping with what the plan recommends than a project that would be developed on an R-60 or even an R-90 basis for the site; that is, the preservation of the open space, and the preservation of the tree cover which as we will notice in some of the other exhibits would be very largely removed in the course of development for single-family houses."

Dr. Rivkin also stated that the proposed project would upgrade the neighborhood to a far greater extent than "almost any other type of development that could go on in Cabin John." He observed that, inasmuch as the proposed project would only result in development of 25% of the site, "there is a [greater] commitment to protect the property than you would have in a normal single-family circumstances with much more of the site actually removed." Dr. Rivkin also stated that, in his opinion, the proposed project would not change the residential character of the neighborhood.

Another witness for the applicants was Page Hopkins, a consulting engineer and surveyor, whose expert qualifications were not challenged. He testified that he had performed a traffic count and study in which he compared the traffic analysis for the proposed project with that of the development in the R-60 and R-90 zones. The results of this study were that, during morning hours of peak traffic, the proposed project would generate 29.4% less trips than would a R-60 standard subdivision; 36.8% less trips than a R-60 cluster subdivision; 11.1% less trips than a R-90 cluster subdivision; and the same number of trips as a standard R-90 development. He concluded that the traffic generated by the proposed project would not constitute a nuisance.

Mr. Hopkins also testified that, in his opinion, access to the subject property would be a matter for negotiation with the Army Corps of Engineers, but that the proposed use does not, in itself, precipitate an access problem. He was also of the opinion that the proposed project would not have an adverse effect on the health or safety of the residents in the area and would have no adverse effect on any general or master plan covering the area. He then gave the following testimony in regard to sanitary sewers:

"There are two sanitary sewer sleeves laid under George Washington Memorial Parkway and capped which would serve the property and then connect it into the existing sewer down below the Parkway."

Counsel for the applicants then asked Mr. Hopkins if it would "be true then [that] water and sewer are both available to the property"? Mr. Hopkins replied: "Yes, sir. We have a letter from the Washington Suburban Sanitary Commission dated January 25 acknowledging that fact."

The letter mentioned was then offered in evidence, without objection, and provides as follows:

"January 25, 1971

"Mr. S. G. Middleman
Polinger Company
Suite 1000 - Chevy Chase Building
5530 Wisconsin Avenue
Chevy Chase, Maryland 20015

Dear Mr. Middleman:

This will acknowledge receipt of your letter of January 19, 1971, concerning availability of water and sewer to serve the 12 acre parcel bounded by MacArthur Boulevard, 78th Street and George Washington Parkway.

Water and sewer are available to serve this parcel, and upon proper application, an engineering

report will be prepared to determine the conditions under which service will be provided.

Very truly yours,

/s/ John M. Brusnighan

John M. Brusnighan<br>Asst. Dir. of Admin.<br>Services"

Mr. Hopkins was also of the opinion that the proposed project would not tend to change the character of the area.

The protestants before the Board introduced into evidence a Status Report from the Washington Suburban Sanitary Commission (WSSC), dated February 11, 1971, which was presented to the State Department of Health and Mental Hygiene on the same day. This Status Report described in detail the problems the WSSC had encountered in obtaining adequate sewage treatment facilities and sewage connections in the Cabin John area. It stated that the Cabin John sewer was "in need of relief" at a cost of $707,000.00. It also stated that there was a need for the closing of a 3,000 foot sewer gap (the Georgetown Gap) at a cost of $2,300,000.00 and that there had been sewer overflows in the Georgetown Gap area. It further stated that there were "no suitable areas for storage of any significant amounts of sewage in or near the area of the overflows." In regard to possible financing of a Cabin John relief sewer by federal and state grants, the Environmental Protection Agency advised WSSC that before the application for federal financing could be completed, additional assurances were needed. We quote from part of a summary by WSSC of a meeting with the Montgomery County Council on February 4, 1971, in regard to the "Georgetown Gap" problem:

> "One of the assurances from the District of Columbia was that WSSC had the right to discharge wastes from Cabin John to the Dulles Interceptor. We informed them that the project as now designed does not connect with the Dulles

Interceptor. Second, they requested assurance from the District of Columbia that the waste from the Cabin John basin can be transported to the Blue Plains Plant through the existing interceptor system without overflowing at any point along the route. Our response was that this question was poised to the Department of Sanitary Engineering of the District of Columbia and that Mr. Freese informed us that such assurance would depend on the following:

"1) Completion of the Potomac Pumping Station located at the east abutment of Roosevelt Island Bridge.

"2) Completion of the tunnel under Lincoln Memorial.

"3) Construction of approximately 3,000 feet of sewer in the vicinity of Key Bridge and 31st Street in Georgetown. It is estimated that this will be in service in the fall of 1972.

"Our response was addressed to the Maryland State Department of Health. We have been informed that the application has been returned to the MSDH. To date, there is no evidence of any further action having been taken either by the Maryland State Department of Health or the Federal Agency.

"5. Dulles connection — relation to Project C and Blue Plains — The relief sewer will be connected to the Commission's Potomac River Interceptor. Permission to connect to the Dulles sewer has been denied by the District of Columbia, but WSSC has filed suit on this question.

"6. Other measures

"a. Surface sewer — The possibility of a temporary surface sewer was explored but was not acceptable to the Montgomery County Council.

"b. Storage devices — A storage facility is not a practical solution to the problem for reasons of topography and access.

"c. Local treatment — A package treatment plant is not practical for the reasons cited above."

The summary describes the overflow situation at the "Georgetown Gap" as follows:

"2. Overflows — location and amount — Overflows in Georgetown at a manhole on K Street near the footings of the old Aqueduct Bridge and the Potomac Boat Club. The manhole has been referred to as 'Old Faithful' because of the frequency and regularity with which it is alleged to overflow. We have not been able to obtain figures on the amount of overflow. (Located in D.C.)"

A number of other witnesses both for and against the proposed project testified before the Board.

Both the Technical Staff of the Montgomery County Planning Board and the Planning Board itself recommended to the County Board of Appeals that the present application be denied.

The County Board of Appeals on June 1, 1971, by a vote of three (Commissioners Gladhill, Burkart and denOuter) to two (Commissioners Berlow, Chairman, and O'Brien) rendered an opinion and passed a resolution approving the application with six conditions. Commissioner O'Brien filed a dissenting opinion in which Chairman Berlow concurred.

After describing the petition for the special exception and the subject property, the majority opinion stated:

"According to the testimony and evidence of record, the petitioners are seeking the subject Special Exception for the purpose of developing the subject tract of land with non-profit housing for the elderly and handicapped, which will be managed and run by the National Council of Senior Citizens.

"The petitioner stated there will be many problems that will have to be worked out in gaining access to the property, as well as long negotiations with the Federal Housing Authority, the Agency which will finance the project. Petitioner is of the opinion that these problems are not connected with the merits of the case, but will require extra time to implement the Special Exception, and requested the Board to consider extending the time to three years should the requested Special Exception be granted.

"There was testimony by the architect that the proposed building will be constructed with soft sand colored brick, and described as a '4-arm' building designed to contain 334 efficiency units and 94 one-bedroom apartments. There will be a complete kitchen in each unit. It is anticipated that two persons will occupy the one-bedroom units. The building will be spread out and will be situated so that it will have three stories on one side, with four and five stories on the down-hill side, and it will not exceed the height limit for the R-90 Zone.

"The model of the building drawn to scale, Exhibit 21, indicates that the site will be well screened with as many trees as possible to be retained, and that there will be additional evergreen tree plantings to be from 14 feet to 16 feet in height at time of planting, and that the scenic view of the site will be undisturbed. There will be walkways and the apartments on grade will have patios. It is proposed that there will be one entrance to the property on each wing, and the building can be entered without going up or down steps. There will be four elevators. Pent-houses will house the cooling and elevator tower. The building will be fire proof, and so designed that it will have no adverse effect on the health and safety of the residents in the surrounding area. The nearest development is to the east and known as the Cabin John Gardens.

"The residents of the project will be aged 62 or over, or, if handicapped, 55 or over. No children will live in the building.

"There was testimony that less than one person in five would drive cars, that there would be a minimal amount of traffic generated by the proposed use, and that there would be no burden on the traffic pattern. Transportation service will be provided as part of the community service. The development will be under the direct supervision of the Senior Citizens; there will be no discrimination for acceptance of members. The rent scale will be under Federal Housing Authority control.

"The Senior Citizens propose, as an ancillary use, to organize a cooperative to provide food purchases; they presently have a national drug service. Services proposed, in addition to the commissary, drug and Sundry store, will be a barber shop, a beauty shop, and a valet shop, and all will be located on the ground floor. No persons other than the residents of the building would be able to use the ancillary facilities. There will be a dining room and kitchen where regular meals will be served once a day to the residents. Each floor above ground level will have laundry facilities and a community room for recreational activities. There will also be areas for medical facilities for the residents.

"There will be a resident manager of the home for the overall management; the bookkeeping will be done by the Senior Citizens. Other employees would include three people on the security shift, kitchen help, and a full time maintenance man for the grounds, and such other maintenance personnel that will be required. It is anticipated that many of the services will be performed by the tenants.

"Testimony by a former member of the Planning Board, Mr. Malcolm Rivkin, regarding the effect the proposed housing would have on the Master

Plan revealed the proposed housing, in his opinion, would be more in conformance with what the Master Plan recommends than what could be developed on the site under the R-60 or R-90 Zone. The proposed plan recommends a preservation of open space and preservation of tree growth, both of which the proposed housing has attempted to do, and, in his opinion, the proposed use would neither violate the Master Plan nor the principle of protecting the palisades. The traffic study conducted in connection with the proposed use indicated that the proposed use would have less traffic than if developed with either R-60 or R-90 residential homes.

"The need for the proposed housing for the elderly was undisputed (Section 111-35.(c)). The evidence establishes that, the number of persons, as proposed, would not cause any adverse effect to the area.

"Opposition to the proposed housing for the elderly at the subject location was based on concern that the petitioners had failed to meet the requirements of Section 111-35, and that the Special Exception use would affect the Master Plan and, in their opinion, would change the character of the area.

"Based on the testimony and evidence of record, the Board finds that: (1) the proposed eleemosynary and philanthropic institution for housing and related facilities for the elderly and handicapped persons will not constitute a nuisance because of noise, traffic, number of people or type of physical activity; (2) the area exceeds the minimum area, frontage, setbacks, and density requirements (Section 111-37. m-1. 3.); (3) only persons 62 years of age or over, or, if handicapped, persons under 62, will occupy the building; (4) the parking exceeds the requirements of Section 111-37. m-1. (5); (5) the proposed use will not affect adversely the use or

680

development of the surrounding area, and will not affect adversely the General Plan for the physical development of the District, as embodied in the Ordinance and in any Master Plan or portion thereof adopted by the Commission; and (6) the proposed use at the subject location will not: (a) adversely affect the health and safety of residents or workers in the area; (b) overburden existing public services, including water, sanitary sewer, public roads, storm drainage, and other public improvements; (c) be detrimental to the use of adjacent properties or the general neighborhood; nor change the character of the general neighborhood in which the use is proposed considering service required at the time of the application, population density, character, and number of similar uses; and (7) the Board finds that the standards set forth for the eleemosynary and philanthropic institution for housing for the elderly or handicapped have been met.

"Accordingly, the requested Special Exception for the use proposed is granted, with time to implement the proposed use extended to three years from the date this opinion is entered in the Minute Book, and subject to the following conditions:

"1. Access to the property shall be worked out with the appropriate agencies before a building permit shall be issued.

"2. The building plan and site plan shall be subject to approval by the Department of Public Works and the Department of Inspection and Licenses before a building permit is issued.

"3. The ancillary services shall not be used by any person other than a resident of the facility.

"4. Screening shall be installed along the Cabin John Gardens' side of the property,

screening to consist of a double row of evergreen trees, at least 16 feet tall at the time of planting.

"5. No exterior signs shall be permitted for the ancillary uses.

"6. The subject property shall be platted in accordance with the Subdivision Regulations prior to the issuance of a building permit."

In the dissenting opinion, the testimony of Mr. Paxson, Senior Planning and Zoning Analyst for the Maryland-National Capital Park and Planning Commission, was reviewed and attention was called to his conclusion that "the proposed structure would not be compatible with effective control of the scenic Potomac Palisades — and we are in wholehearted agreement with this conclusion."

In regard to the question of overburdening existing sanitary sewer and existing public roads, the dissenting opinion stated:

"The Ordinance requires the Board to find that the existing sewer facilities will not be overburdened. The evidence of record reveals that the Washington Suburban Sanitary Commission has been instructed not to issue any additional authorization for sewer services within the Cabin John Creek Drainage Basin until such authorizations are approved by the State Secretary of Health and Mental Hygiene. The applicant submitted no proof that the Secretary would permit sewer service to the subject property.

"The Ordinance requires the Board to find that the existing public roads will not be overburdened by traffic to and from the proposed use. The U.S. Corps of Engineers has declared that it will not issue any more permits until the County constructs suitable roads to replace MacArthur Boulevard. The Corps points to the danger to the water conduit

that would result from increased use of MacArthur Boulevard."

The dissenting Board Members also were of the opinion that the proposed use would be detrimental to the use of adjacent properties as single-family residences and to the general neighborhood since it would dominate the neighborhood because of its disproportionate size. Thus, it was felt that the proposed project would change the character of the general neighborhood.

Upon appeal to the Circuit Court for Montgomery County, Judge Moorman, for that court, filed an opinion on May 25, 1973, indicating that the record was not "devoid of substantial evidence" to support the Board's findings, and hence the findings of the Board were not arbitrary or capricious. On the same day, he filed an order affirming the decision of the Board from which the present appeal was timely taken.

In regard to the critical issue of the findings, namely, that the proposed use would not overburden existing public services, such as water and sanitary services, Judge Moorman stated in his opinion:

"The next error raised by the appellants is their contention that the applicants did not meet their burden of proof in showing that the institution would not overburden public roads and existing sanitary facilities. As provided by Section 111-35 of the Zoning Ordinance, the Board, prior to granting the special exception, was required to find by a preponderance of the evidence that the proposed institution would not overburden public roads and sanitary services. In this regard there was introduced at the hearing a letter (Exhibit No. 26) from the Washington Suburban Sanitary Commission stating that water and sewer service would be available for the subject site. While the appellants impliedly argue that this letter does not indicate that the Commission took into account the nature of the facility to be constructed on the site,

this Court finds it inconceivable that the Commission would have given such assurances without regard to the quality or quantity of the sewer service needed on the site. Moreover, if the Board had any doubt about the validity of the letter from the Commission, this Court is convinced that the Board would have made additional inquiry."

We are by no means sure that the WSSC letter of January 25, 1971, which we have already set out in full, has the efficacy given it by the Board and by Judge Moorman. This letter was the only evidence to support the applicants' burden of establishing by a preponderance of the evidence that the proposed use would not *overburden* existing public sanitary services. The zoning ordinance does not establish the standard of whether sanitary sewer facilities are *available* for a proposed project, but it does establish the standard of whether a proposed use will *overburden existing* sanitary sewers.

We are unwilling to reverse the order of May 25, 1973, upon the ground that the applicants failed entirely to meet their burden of proof in regard to "overburdening" existing sanitary sewers inasmuch as the language of the WSSC letter of January 25, 1971, in regard to "availability" might raise possible inferences that if an application for a connection with the existing sanitary sewers were made for the proposed project, it would be granted — (although the language of the second paragraph of that letter rather suggests that such a determination has not been presently made but would await an engineering report "to determine *the conditions* under which service *will be provided*" (emphasis supplied) — and, if granted, the facts in the hands of the WSSC would establish that the proposed use would not overburden the existing sanitary sewers.

In our opinion, however, this letter of January 25, 1971, is too frail a reed to support a decision in the case that the applicants met their burden of proof by a preponderance of the evidence that the proposed use would not, in fact, overburden the existing sanitary sewers.

We have concluded that under these circumstances, the wise course to pursue is to remand the case without affirmance or reversal, pursuant to Maryland Rule 871, to the lower court for further remand by it to the Board to take additional testimony on this issue. The basic facts in regard to this issue are most likely in the hands of proper officials of the WSSC. The benefit of such testimony, as well as of any other testimony, should be made available to the Board in considering and deciding this issue.

In remanding the case under Rule 871, the order of the lower court of May 25, 1973, and the resolution and decision of the Board are vacated so that the Board, in its sound discretion, may also take additional testimony on issues other than the issue of the overburdening of the existing sewer facilities so that it may reconsider such other issues on the testimony already taken.

We are reluctant to remand the case under Rule 871 because of the substantial delay in reaching a final resolution of the important issues involved; but, as we have stated, we deem it wise to do this. We suggest that the Board give this matter its preferred attention upon the remand.

Since the case is remanded under Rule 871, the Board will also have the opportunity to comply fully with the requirement of Section 59-4(d) of the zoning ordinance now in effect in Montgomery County that "each resolution shall contain a statement of the grounds and findings forming the basis of such action or decision."

We have already set out substantially all of the opinion of the majority of the Board. It indicates that almost all of the Board's recitation and consideration of the facts in the case relate to *undisputed and uncontroverted* facts concerning the staffing plans of the applicants, the age of the persons to occupy the proposed project, the need for the proposed facility for housing the elderly, and the effects of the proposed project taken from Dr. Rivkin's testimony. There was a general statement in regard to the grounds set forth by those opposing the granting of the application but there were no specific findings in regard to those grounds. No

mention is made of the WSSC letter of January 25, 1971, and there is no attempt by the majority of the Board to draw any inferences from the contents of that letter. On the mandatory requirements of Section 59-123 (formerly Section 111-35 of the Montgomery County Code, 1965), the opinion merely repeats the exact language of this section as its "findings." In our opinion, this is not a sufficient compliance with the requirement of Section 59-4(d), already mentioned. We condemned a similar approach by a Zoning Board to its obligation to make "findings of fact and conclusions of law" to accompany the decision and final order of the Zoning Board in *Pistorio v. Zoning Board,* 268 Md. 558, 302 A. 2d 614 (1973), citing with approval and following our decisions in *Board of County Commissioners for Prince George's County v. Luria,* 249 Md. 1, 238 A. 2d 108 (1968) and *Board of County Commissioners for Prince George's County v. Ziegler,* 244 Md. 224, 223 A. 2d 255 (1966); and see *Chevy Chase Village v. Montgomery County Council,* 258 Md. 27, 38-40, 264 A. 2d 861, 867-68 (1970) in which we observed that former Section 111-49 (a) (now Section 59-4(d)) is "quite similar" to the requirements of Section 59-104 of the Prince George's County Code. In *Chevy Chase Village,* we cited with approval and followed our decision in *Montgomery v. Board of County Commissioners for Prince George's County,* 256 Md. 597, 261 A. 2d 447 (1970) in which we remanded the case so that the Board in that case could comply with the statutory direction to make basic findings and conclusions.

We suggest that an acceptable format for the Board's findings and conclusions upon the remand would be to set out its finding that the particular requirement had, or had not, in its opinion, been established by the applicants and then add "because the Board finds the following facts to be true:"

(Insert the facts here)

"and does not accept as true the following testimony:"

(Insert the rejected testimony here).

In this way, a court on appeal will be able to ascertain

whether there was sufficient evidence to support the Board's findings and conclusions.

> *Case remanded to the lower court with directions to remand it to the County Board of Appeals for further proceedings in accordance with this opinion, the costs of this appeal to be paid by Montgomery County, one of the appellees; the costs in the lower court and the costs in the prior appeal in No. 349, September Term, 1971, Redden v. Montgomery County, 265 Md. 567, 290 A. 2d 494 (1972) to abide the result.*