# MONTGOMERY COUNTY, MARYLAND *v.* NATIONAL CAPITAL REALTY CORPORATION ET AL.

[No. 65, September Term, 1972.]

*Decided December 14, 1972.*

The cause was submitted on brief to MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

Submitted by *Richard S. McKernon, County Attorney, Alfred H. Carter, Deputy County Attorney,* and *Stephen J. Orens* and *Stephen P. Johnson, Assistant County Attorneys,* for appellant.

No brief filed on behalf of appellees.

LEVINE, J., delivered the opinion of the Court.

This appeal by Montgomery County is from an order of the circuit court reversing a decision of the County Council, sitting as the District Council (the Council), which denied to appellee a zoning reclassification of a parcel of land situated on the northern periphery of the Silver Spring business district.

The subject property, consisting of 1.4 acres, is rectangular in shape and is located on Spring Street, extending the full width of the block between Georgia and First Avenues. The application sought rezoning to the C-2 classification (general commercial) from the C-O category (commercial office building). The land had been placed in the C-O zone by the Council in two stages, in May, 1962 and June, 1963, respectively. The parcel had been in the R-60 zone (one-family, detached residential) since 1954, when the adoption of a new zoning ordinance and accompanying maps effected a comprehensive rezoning.

Property to the north is zoned R-60, and it is plainly evident that Spring Street has always been regarded by the planning and zoning authorities as the northern boundary of the Silver Spring business district. To the west and southwest, the dominant zoning feature is C-O, while to the south, especially along the Georgia Avenue corridor, there is a well-established pattern of C-2. In this connection, however, it becomes important to note that a considerable portion of the property immediately to the south and southwest of the subject property, although zoned C-2, has, in fact, been developed as high-rise residential, largely due to the demand for such housing which began in the early 1960's and a loophole, since closed, in the C-2 classification of the zoning ordinance. The result of this has been that while on paper there appears to have been a degree of rezoning activity to the C-2 zone (general commercial) during that period, the movement has actually been towards intensive apartment house construction coupled with a modest amount of "street-floor" retail development on Georgia Avenue. The most conspicuous example is the property immediately to the south containing 3.2 acres of land on which there have been erected 892 units known as the Georgian Towers.

At the time the rezoning petition was being considered, the subject property was covered by a master plan known as the Zoning Plan for the Silver Spring Business Dis-

trict and Vicinity adopted in 1957. The zoning requested here was contrary to that plan, which apparently divided the subject property between the high-rise and commercial office building categories. At the time the application was under consideration, however, the design of a new plan was in progress. Although not yet adopted when the Council rendered its decision, throughout the period the application was being processed, the new plan was considered by the Planning Board technical staff, the hearing examiner and the Council in its "preliminary" and "draft" forms, respectively. That plan, in each of its phases, recommended high-density, residential use for the subject property.

The technical staff of the Planning Board recommended denial of the application, noting that its consultants had "emphasized the fact that the area in question is considered one of the most critical areas due to its location at the northern periphery of the [Central Business Core] in close proximity to established single-family residential areas. [They] also pointed out that the Central Business Core Plan was in large part based on the premise of encouraging inward development and establishing a functional land use pattern with adequate transitions and buffers between the low-density residential land use areas [to the north] and the high intensity commercial and residential areas [to the south]." Thus, the staff concluded that "maximum development of the site under . . . C-2 with its 143-foot height limit and 100% ground coverage . . . would not be appropriate nor conducive to the effectuation of the described transition."

In rejecting the staff recommendation and voicing support for the application, the Planning Board was influenced almost entirely by a Declaration of Covenants which was prepared and submitted by appellee. In relevant part, the Declaration recited:

> "WHEREAS, the Montgomery County Zoning Ordinance does not convey the right of site plan approval in the C-2 Zone to the Board,

but Grantor is nevertheless willing to submit the subject property to Planning Board approval *in the event* [the application] is granted . . . ."

Attached to the Declaration as an exhibit was a "site plan" in accordance with which, it was agreed, the property would be substantially developed. The Declaration also provided:

"These covenants, *conditions* and restrictions shall become effective *upon* the approval of [the zoning application], and shall have no effect *unless* said zoning application is approved.

"*Subject to the foregoing,* these covenants, conditions and restrictions are to run with the land and shall be binding . . . .

". . . These covenants shall terminate automatically *in the event* the Montgomery County Zoning Ordinance is amended to provide for site plan approval by the Board in the C-2 Zone. (emphasis added)

* * *"

At the hearing before the zoning examiner, appellee produced an array of experts who, in the course of their extensive and by no means unappealing testimony, which was buttressed by a number of exhibits, made the following contentions:

1. That there had been, since the last comprehensive zoning, a considerable development of properties to the south within the C-2 zone.

2. That, largely due to the covenants, development of the property within the C-2 zone, rather than in the existing C-O zone, would lead to a more attractive result with a setback neither required nor feasible under C-O, together with less density and ground coverage.

3. That appellee's proposal, reflected by its site plan, would result in an office building with attractive shops at the lower level.

4. That appellee's proposal would provide an attractive gateway to the Silver Spring business district.

5. That the dual-use concept of office space and retail stores would insure for the neighborhood a people-oriented vitality in the evening as well as during the day.

6. That construction in accordance with the site plan would afford adequate offstreet parking within the building that would be unobtrusive.

A representative of the local citizens' association appeared as a protestant to the application. In substance, he stated that residents of nearby homes were concerned with the likelihood of increased automobile traffic which, due to the intense high-rise development without adequate offstreet parking in the vicinity, coupled with additional parking demands generated by the office building on the next block of Spring Street, had already overtaxed neighborhood streets. In addition, projected traffic presented a concern to parents of school children, since the Woodside Elementary School is located only one block north of the subject property. This position was further underscored by a letter in the record from the same association which pointed out that the Georgian Towers, although containing 892 units, provided merely 344 interior parking spaces.

Another prominent feature of the record before the Council were two reports which were directed to the hearing examiner by Mr. William H. Hussmann, Director of the County Office of Program Coordination, and a planner in his own right. In his first memorandum dated January 23, 1970, Mr. Hussmann recommended denial of the application, citing principally the location of the property at the northern "edge of the Silver Spring Central Business District," and the need for a " 'transition between the heavy concentration of commercial uses located to the south and east and the single-family residential development to the north' " that had been envisioned when the subject property was placed in the C-O zone in 1962 and 1963. He concluded that appellee's proposal would "attract a significant amount of automobile rather than pedestrian traffic. In character, it would

be more like a typical local shopping center than it would be a central business area development."

Mr. Hussmann later experienced a change of mind, and on February 26, 1970 wrote to the hearing examiner withdrawing his earlier recommendation of denial. The second report clearly indicated that in reversing his position, he was influenced entirely by the covenants and site plan attached thereto. However, while impressed with the proposed plans, he was not without his reservations concerning their implementation, and added:

> "[T]he granting of the C-2 Zone provides the opportunity for the applicant to apply for a special exception for a gas station or a drive-in restaurant. These uses are not appropriate in this location, and if I thought that this were the intent of the applicant, I would continue to recommend denial."

In his thoroughly-considered report to the Council, the examiner noted that:

> "The issues to be determined in this case are whether there has been sufficient change in the character of the neighborhood to justify the requested reclassification, whether the requested reclassification is in accord and harmony with the comprehensive zoning plan for the area, and whether such reclassification is in the public interest.
>
> * * *
>
> "The only fully adopted Master Plan covering the subject property is the Zoning Plan for Silver Spring Business District and Vicinity adopted on December 9, 1957. The requested reclassification is not in conformance with the recommendations of this Plan . . . . Both the Preliminary Plan and the Final Draft of the Silver Spring Master Plan have recommended high-density, residential uses for the subject property within the Central Business Core. Con-

sequently, the requested reclassification to the C-2 Zone is not in conformance with the recommendations of the most recent comprehensive zoning plan for the area, namely the Final Draft of the Master Plan for the Silver Spring Planning Area.

* * *

"It is my opinion that the applicant has failed to show sufficient changes in the character of the surrounding neighborhood to justify the requested reclassification. The only reclassification to the C-2 Zone cited by the applicant [was the granting of application C-941 in 1963. This property is] closer to the center of the Silver Spring Central Business District than is the subject property. [This property does not] confront single-family detached residences as does the subject property . . . ."

In recommending denial of the application for the C-2 zone, the examiner also recognized the impermissibility of rezoning in reliance on covenants to be recorded by a zoning applicant. Aided by an opinion requested of the County Attorney, he concluded that for the Council to grant the reclassification "based wholly on the recommendations of the Planning Board and the Program Coordinator [Mr. Hussmann], which are strictly conditioned upon the acceptance of the covenants, the District Council would be rezoning conditionally. As pointed out by the County Attorney, conditional zoning is not permitted in Montgomery County."

The Council denied the application, adopting, in effect, the report of the examiner. In so doing, it expressly stated in its opinion:

"It is our opinion that the recommendations of the Planning Board and the Program Coordinator in this case are entitled to little or no weight because they are based almost in their entirety upon the proposed covenants and are therefore conditional.

"It is also our opinion that there have been insufficient changes in the character of the surrounding neighborhood to justify the requested reclassification . . . . This apartment hotel [Georgian Towers] is essentially a residential use although it does contain some limited commercial facilities on the first floor. The other uses surrounding the subject property are either individual single-family homes or office buildings . . . ."

From that denial, an appeal was taken to the circuit court where the case came on for hearing before Judge Moorman, who reversed the council decision and ordered that the zoning application be granted. We have carefully inspected the rather imposing record in this case and we have found neither a transcript of the proceedings before him nor the memoranda referred to in his opinion. We therefore assume that the many points enumerated in the Petition on Appeal to the circuit court were pressed at the argument. They boil down to the following claims:

1. The Council erred in concluding that reliance upon the covenants would constitute conditional zoning.

2. That it was error for the Council to consider a "Final Draft" of the Master Plan, since it had not yet been adopted.

3. There had been a substantial change in the character of the neighborhood since the last comprehensive zoning in 1954, and it was arbitrary and capricious for the Council to reach a contrary decision.

Judge Moorman focused on the last argument, and in reliance upon *Board v. Oak Hill Farms,* 232 Md. 274, 192 A. 2d 761 (1963), ruled that "the action of the District Council was unsupported . . . by competent, material and substantial evidence and, therefore, was arbitrary and capricious." We have concluded that he erred and, because we regard them as dispositive of this appeal, we shall consider seriatim those points listed above.

## (1)

Entirely apart from the "change" argument, we think resolution of the question whether the convenants constituted a form of impermissible conditional zoning is decisive of this case. For, as we have seen, by a determination of that point in appellant's favor, two of the main props to appellee's case would topple, i.e., the favorable recommendations of the Planning Board and Mr. Hussmann, respectively. This would then confront appellee with unfavorable positions of the staff and Hussmann and without any public agency support.

We think it clear that the covenants, coupled with the site plan attached thereto, if adopted as a basis for the requested reclassification, would have produced a form of conditional zoning. If recorded, the covenants would have bound appellee to compliance only on the condition that the C-2 classification first had been granted. Had the Council then granted the application on the strength of the covenants, as encouraged to do so by Mr. Hussmann and the Planning Board, it would have committed what we believe would have been a classic illustration of conditional zoning. The invalidity of conditional zoning in Maryland is not seriously open to question. *Citizens Ass'n v. Pr. Geo. County,* 222 Md. 44, 158 A. 2d 663 (1960) ; *Rose v. Paape,* 221 Md. 369, 376-77, 157 A. 2d 618 (1960) ; *Baylis v. City of Baltimore,* 219 Md. 164, 169-70, 148 A. 2d 429 (1959). It is interesting to note that in none of those cases was there cited a provision comparable to § 111-48 (d) of the Montgomery County Zoning Ordinance, also codified by that same designation in the Montgomery County Code, 1965, which provides:

> "No application for a local or a sectional or District plan map amendment shall be approved conditionally for the erection on the land of a structure at a particular location, or within a particular time, or by a particular person, or of a particular type, or for the subdivision of the

land in a particular manner, or on any other condition."

In 3 Rathkopf, *Zoning and Planning*, 74-9, it is stated:

". . . The general rule in these jurisdictions in which the validity of such covenants has been litigated is that they are illegal. The basis of such rule is that the rezoning of a particular parcel of land upon conditions not imposed by the zoning ordinance generally in the particular district into which the land has been rezoned is prima facie evidence of 'spot zoning' in its most maleficent aspect, is not in accordance with a comprehensive plan and is beyond the power of the municipality.

"Legislative bodies must rezone in accordance with a comprehensive plan, and in amending the ordinance so as to confer upon a particular parcel a particular district designation, it may not curtail or limit the uses and structures placed or to be placed upon the lands so re-zoned differently from those permitted upon other lands in the same district. Consequently, where there has been a concatinated rezoning and filing of a 'declaration of restrictions' the general view (where the question has been liti-gated) is that both the zoning amendment and the restrictive covenant are invalid for the rea-sons expressed above."

Although the rule followed in Maryland has undergone erosion in some states, we believe that it continues to be supported by the weight of authority.

Nor is appellee helped by our decisions in *Funger v. Mayor of Somerset*, 249 Md. 311, 328, 239 A. 2d 748 (1968) and *Greenbelt v. Bresler*, 248 Md. 210, 215-16, 236 A. 2d 1 (1967). What distinguishes those cases from those we have cited earlier is that in each, the municipality within which the subject land was located

agreed to support the rezoning application before the respective county legislative body in exchange for certain commitments entered into by the applicant. Thus, since in both cases the legislative body was not a party to the agreement, neither the rezoning nor the agreement was invalidated. For the reasons we have stated, the Council was correct in refusing to grant the rezoning upon the conditions expressed in the Declaration of Covenants and the attached site plan.

Nothing we have said in distinguishing *Funger* and *Greenbelt* from the cases involving agreements entered into by legislative bodies supports enforceability of the covenants here by the Planning Board, since, as we have noted, the covenants were to become binding on appellee only if the Council granted the application. In short, we are concerned here merely with the fact that the Planning Board's favorable report was predicated solely on the existence of covenants which, in light of our holding, were worthless. Thus, they imparted the same value to the recommendation of the Board. What we have just said doubtlessly applies with greater force to Mr. Hussmann's recommendation, as he, being a county employee and in no respect a party to the covenants, gratuitously considered them in arriving at his favorable conclusion. Thus, we think the Council was correct in refusing to rely upon the covenants while deciding the zoning application, and the favorable recommendation of the Planning Board and Mr. Hussmann were entitled to no weight.

## (2)

Appellee complained below that the Council considered the "Final Draft" of the proposed Master Plan even though it had not been received in evidence before the examiner. We find no error in this regard. The record indicates that while the "Final Draft" was not available at the public hearing, the preliminary plan was. The short answer to appellee's contention is that in both, the subject property was recommended for high-density residential use.

Moreover, administrative agencies are not generally bound by the technical common-law rules of evidence, although they must observe the basic rules of fairness as to parties appearing before them. Thus, even hearsay evidence may be admitted in contested administrative proceedings. *Maryland Fire UW v. Insurance Comm'r*, 260 Md. 258, 267, 272 A. 2d 24 (1971) ; *Neuman v. City of Baltimore*, 251 Md. 92, 97, 246 A. 2d 583 (1968) ; *Dal Maso v. Board of County Comm'rs of Prince George's County*, 238 Md. 333, 209 A. 2d 62 (1965). In our careful search of the record, we have detected no procedural unfairness.

### (3)

We turn now to the question of whether appellee met its burden of showing that there had been a substantial change in the character of the neighborhood.

Should there be any doubt at this point, we must be mindful, even as we believe the learned trial judge was not, that courts may not substitute their judgment for the expertise of the zoning authority. The test where that authority has declined to rezone is whether there was legally sufficient evidence to support its decision, in other words, whether its decision was "fairly debatable." Thus, one attacking a denial of rezoning must show that the refusal was arbitrary or capricious. *Malasky v. Montgomery County Council*, 258 Md. 612, 267 A. 2d 182 (1970) ; *Wier v. Witney Land Co.*, 257 Md. 600, 263 A. 2d 833 (1970) ; *Montgomery County v. Laughlin*, 255 Md. 724, 259 A. 2d 293 (1969) ; *Montgomery County Council v. Shiental*, 249 Md. 194, 199, 238 A. 2d 912 (1968).

On the issue of change, there is a serious defect in appellee's claim, in that no effort was made by it to delineate what the neighborhood was in which it claims the substantial change occurred. *Prince George's Co. v. Prestwick*, 263 Md. 217, 226, 282 A. 2d 491 (1971) ; *Malmar Associates v. Board*, 260 Md. 292, 305, 272 A. 2d 6 (1971) ; *Chevy Chase Village v. Montgomery Co.*,

258 Md. 27, 41-44, 264 A. 2d 861 (1970). In any event, we have repeatedly held that there is a strong presumption of the correctness of original zoning and of comprehensive rezoning. Hence, to sustain a piecemeal change therefrom, there must be strong evidence of mistake in the original zoning or in the comprehensive rezoning or else a substantial change in conditions. *Prince George's Co. v. Prestwick, supra; Habliston v. City of Salisbury,* 258 Md. 350, 265 A. 2d 885 (1970) ; *Chevy Chase Village v. Montgomery Co., supra.*

Here, as both the hearing examiner and the Council noted, appellee cited in support of its claim that there had been a change, the reclassification of the Georgian Towers property to the C-2 zone. But, even this property, which, it must be noted, is to the south of the subject property, is fundamentally a high-rise apartment house with stores only on the street level. What appellee may have overlooked, moreover, was, even if we recognize, depending on where the "neighborhood" boundaries are fixed, that there may have been some modest "change" towards C-2, we have held that "[e]ven if there has been some significant evidence of substantial change in the character of the neighborhood, it is established that change which would support a rezoning does not compel it absent probative evidence that no reasonable use can be made of the property in its current zoning classification." *Wright v. McCubbin,* 260 Md. 11, 13, 271 A. 2d 365 (1970) ; *Hardesty v. Dunphy,* 259 Md. 718, 271 A. 2d 152 (1970) ; *Messenger v. Board of Co. Comm'rs,* 259 Md. 693, 271 A. 2d 166 (1970) ; *Cabin John Limited Partnership v. Montgomery County Council,* 259 Md. 661, 271 A. 2d 174 (1970). No effort was made to present such evidence here.

In sum, we are of the view that the Council determination that there had been no substantial change in the character of the "neighborhood" was fairly debatable and was supported by substantial evidence. Thus, its refusal to rezone was neither arbitrary nor capricious

and should have been affirmed on appeal to the circuit court.

*Order reversed; appellees to pay costs.*