# PATTEY ET AL. *v.* BOARD OF COUNTY COMMISSIONERS FOR WORCESTER COUNTY ET AL.

[No. 200, September Term, 1973.]

*Decided March 29, 1974.*

354

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*K. King Burnett* for appellants.

*Joseph E. Moore*, with whom were *Edward H. Hammond, Jr., Patrick L. Rogan, Jr., Eric L. Cummings* and *Arent, Fox, Kintner, Plotkin & Kahn* on the brief, for Chincoteague Bay Limited Partnership, one of appellees. No brief filed on behalf of Board of County Commissioners for Worcester County, other appellee.

LEVINE, J., delivered the opinion of the Court.

A large number of Worcester County residents bring this appeal from a circuit court decision affirming a zoning reclassification of 1870 acres in the Fourth Election District of that county. The county commissioners, who approved the zoning application, and the applicant, Chincoteague Bay Limited Partnership, are the appellees; appellants appeared as protestants at the hearing before the county commissioners.

The property sought to be rezoned actually belongs to a total of some sixteen persons with whom the applicant has entered into contracts of purchase. The land is described generally as bounded by Chincoteague Bay on the east, Langmaid Road on the north, Harmon Landing Road on the south, and Basketswitch Road on the west. It is some seventeen miles south of Ocean City by road, and is separated from Assateague Island by the Bay. Most of it lies in the A-1 (agricultural) district with the portion closest to the Bay being zoned C-1 (conservation) district. Under the county's zoning ordinance, initially adopted in 1965, minimum lots of one acre are required in the A-1 district. The conservation district, as that name would suggest, is restricted to summer cottages and trailers on lots of at least

two acres in size. The zoning application sought the following classifications:

| | | |
|---|---|---|
| 332 acres | R-2 (urban residential) |
| 1,018 acres | R-3 (apartment district) |
| 409 acres | R-4 (hotel district) |
| 80 acres | R-5 (general residence district) |
| 31 acres | B-1 (neighborhood business) |
| 1,870 acres | | |

The zoning ordinance requires minimum lot sizes of 7,500 square feet in the R-2 classification and 5,000 in the other categories.

As we have indicated, zoning was introduced to Worcester County by the enactment of an ordinance in 1965. This action was accompanied by the adoption of an original comprehensive zoning map for the entire county. Although a land use plan (the Plan) was not promulgated until the following year, it was preceded, as were the 1965 actions, by the establishment of a planning commission and the employment of a zoning consultant, Julius Tarrant (Tarrant), who conducted a thorough study leading to the production and ultimate adoption of the Plan. The Plan indicated that the area in which the subject property is located should ultimately be the site of "non-urban residential development." It was envisioned that this category would be utilized in the following manner:

> "*Non-Urban Residential Areas.* These include both existing and projected developments of a primarily single-family residential nature, *at such densities as will not require central water or sewer systems. Not more than 2 dwellings per gross acre can be permitted safely where individual wells and septic tanks must be relied upon.* The average density more likely will be around 1 or $1^1/_2$ dwellings per acre, after allowance for the necessary roads, streets, odd-shaped lots, and waste areas. Not included in this designation are the rural non-farm dwellings, existing or future, which are

and will continue to be scattered generally throughout the rural parts of the county, on larger sites and independent of any community facilities. The non-urban residential areas are intended primarily for the large-lot subdivisions where roads or streets would be provided, along with incidental churches, playgrounds, community houses, and other facilities associated with residential areas and not of a commercial nature." (emphasis added and omitted).

The zoning application, filed in 1972, sought the classifications listed above on the sole ground that the subject property "has changed in character due to recent development programs in the County such as Ocean Pines"; furthermore, it was alleged, "[t]he County's future land use map, in fact, indicates that this tract should be used for Residential purposes." The application was initially referred to the Worcester County Planning Commission which, after noting that the Plan projected the area "as a potential site for non-urban residential type development," recommended that the application be approved subject to certain enumerated conditions. The thrust of those conditions was that the density of the area for which R-3 (apartment) zoning was recommended, be maintained at the R-2 (urban residential) level of four dwelling units per acre and minimum lot sizes of 7500 square feet.

On June 6, 1972, the matter was heard by the county commissioners. At that hearing, the principal witness for the applicant was Calvin Burns who had also signed the application as its agent. He is a mechanical and civil engineer and had been the consulting engineer for the Ocean Pines development, a planned community near Ocean City. One other witness for the applicant was a zoning inspector who, when asked whether he was not of the opinion "that a mistake occurred [in the Plan]," replied instead, "I think the Planning Commission was somewhat foresighted when they anticipated that this land, eventually, in twenty years would probably be subject to residential development." The two remaining witnesses for the applicant, Mr. Jerry Wolman,

its general partner, and a Mr. Morris of the planning commission, added no testimony of significant quality. Many of the protestants also presented their views in opposition to the application.

A week later, after receiving a letter from the applicant accepting the conditions recommended by the planning commission, the county commissioners voted unanimously to approve the application. This decision was announced in the form of a "release" in which it was found that there had been:

> ". . . a sufficient change in the area of Worcester County to meet these standards. Development of Assateague Island's Federal and State Parks has brought about a tremendous influx of vacationers with very little overnight accommodations for these people. The growth of the Tenth Election District (Ocean City) has caused a tremendous impact on the outlying area. . . ."

On September 15, 1972, three months after the application had been approved and two months after that decision had been appealed to the circuit court, the county commissioners issued a document called *"HARBOR TOWN REZONING — FINDINGS OF FACTS."* That paper purported to amplify rather extensively the grounds for approval of the rezoning application. The county commissioners concluded that there had been a substantial change "in the character of the neighborhood where the property is located since the promulgation of the original comprehensive land use *plan."* (emphasis added). They based their conclusion upon these findings:

> 1. Increased development had occurred elsewhere in the county, especially in the Ocean City area, including the Ocean Pines community.
> 2. That the newly built sewage treatment plant at the Town of Newark had sufficient reserve capacity to serve the applicant's needs for four or five years; thereafter, its own "self-contained" treatment system would be in existence.

3. That State Route 113, some two miles to the west of the subject property, was to be improved; and that the applicant had agreed to provide access and interior roadways for its development.

4. The establishment of Assateague Island as a National Seashore Park by the federal government had created a need for overnight accommodations on the mainland — especially in the area of the subject property — since the park is geared primarily to daytime use.

5. A prior rezoning of property in the area of Porter's Neck and Cropper's Island from agricultural and conservation uses to R-1 (rural residential).

The decision of the county commissioners was appealed to the circuit court. After resolving some preliminary procedural disputes, none of which merits any reference here, the trial court rendered its decision — 106 pages in length — affirming the approval of the rezoning application. We reverse.

In upholding the reclassification, the trial court injected the issue of "mistake" into the case, although previously it had been mentioned only once — in the aborted question referred to earlier in this opinion. In addition, the court also ruled that there was sufficient evidence of "change" to sustain the application. It rested this part of its decision on the availability of the Newark water and sewer system and the "appropriation" of Assateague Island for a National Seashore Park.

In their appeal to this Court, appellants present a number of reasons for urging reversal of the decision below, including some which are based on constitutional grounds. In the view we take of this case, however, we need consider only the question whether the rezoning decision can be sustained in light of the requirement in Maryland Code (1957, 1970 Repl. Vol.) Art. 66B, § 4.05 (a) "that there was a substantial change in the character of the neighborhood where the property is located or that there was a mistake in

the existing zoning classification." The parties are in agreement that the "change-mistake" rule was the controlling standard to be applied by the county commissioners in deciding whether to grant the rezoning application.

Since this case involves an attempt to amend an original comprehensive zoning map, it is dominated by the strong presumption of correctness which attaches to such original zoning, *Valenzia v. Zoning Board,* 270 Md. 478, 483, 312 A. 2d 277 (1973); *Trainer v. Lipchin,* 269 Md. 667, 672-73, 309 A. 2d 471 (1973); *Stratakis v. Beauchamp,* 268 Md. 643, 652, 304 A. 2d 244 (1973); *Rockville v. Henley,* 268 Md. 469, 472, 302 A. 2d 45 (1973). As we said in *Stratakis:*

> ". . . To sustain a piecemeal change in circumstances such as those present here, *strong* evidence of mistake in the original zoning or comprehensive rezoning or evidence of substantial change in the character of the neighborhood must be produced, (citations omitted)." 268 Md. at 652-53 (emphasis in original).

The burden of producing such "strong" evidence, as we also noted there, is an onerous one, *Trainer v. Lipchin; Stratakis v. Beauchamp,* both *supra; Cabin John Ltd. v. Montgomery Co.,* 259 Md. 661, 670, 271 A. 2d 174 (1970).

Mindful of this fundamental principle, we consider this case in light of the "change-mistake" rule, turning first to the trial judge's determination that the rezoning should be upheld on the basis of "mistake."

I

There is considerable doubt, as appellants urge, that the question of "mistake" was properly considered by the circuit court, since evidence on this issue was actually never presented to the county commissioners nor was the question considered by them in approving the application, or by the planning commission in recommending that they do so. As we have already indicated, the "mistake" issue surfaced initially in the trial judge's decision. On appeal from a

zoning decision of a legislative body, the reviewing court is generally confined to a determination of whether sufficient evidence has been presented at the zoning hearing to make the issues fairly debatable, and may only consider for that purpose evidence which is on the record. *Aspen Hill Venture v. Mont. Co.*, 265 Md. 303, 316-17, 289 A. 2d 303 (1972); *Montgomery Co. Coun. v. Kaslow*, 235 Md. 45, 52, 200 A. 2d 184 (1964); *see Suburban v. Rockville Council*, 241 Md. 1, 6, 215 A. 2d 200 (1965). Furthermore, Art. 66B, § 4.05 (a) requires that the legislative body make findings of fact where the effect of its action "is to change the zoning classification." These requirements are virtually stripped of their significance if, on appeal, the reviewing court may furnish its own grounds for granting the requested classification.

Wholly apart from whether the issue was properly before it, the circuit court erred in ruling that there was sufficient evidence of "mistake" to make that issue fairly debatable. The trial judge purportedly concluded that a "mistake" had been made in the "delineation of the 'Districts' upon the official General Zoning Map of Worcester County" as well as the "Official Land Use Plan Map." It is apparent from his entire opinion, however, that the "mistake" on which he bottomed his decision, was that made by the planning consultant in recommending that "too much land [be] reserved under an agricultural classification." In short, the trial court took the planners to task rather than the county commissioners, who adopted the agricultural and conservation classifications for the subject property in 1965.

Thus, the trial judge fell into error by ignoring the basic distinction between a master plan, on the one hand, and a zoning map, comprehensive zoning, or zoning classification, on the other. *Nottingham Village v. Balto. Co.*, 266 Md. 339, 354-55, 292 A. 2d 680 (1972); *Chapman v. Montgomery County*, 259 Md. 641, 644, 271 A. 2d 156 (1970); *Bd. of Co. Comm'rs v. Edmonds*, 240 Md. 680, 685, 215 A. 2d 209 (1965). As we have said, a master plan is only a guide and is not to be confused with a comprehensive zoning, zoning *map*, or zoning classification, *Nottingham Village v. Balto. Co.;*

*Chapman v. Montgomery County; Bd. of Co. Comm'rs v. Edmonds*, all *supra.* It is a "mistake" in the latter, not in the master plan, which may support a rezoning.

As we have indicated, the conclusions of the trial judge on the issue of "mistake" were unsupported by evidence of any kind presented at the zoning hearing, much less by any expert testimony. To support a zoning reclassification, there must be evidence before the legislative body which establishes that the "mistake" was "basic and actual"; and that it was made *"at the time"* the property was zoned, which in this case would have been at the time of the original zoning in 1965. *Surkovich v. Doub,* 258 Md. 263, 271, 265 A. 2d 447 (1970); *Miller v. Abrahams,* 239 Md. 263, 266, 211 A. 2d 309 (1965) (emphasis in original). Furthermore, the "mistake" alleged to have occurred must relate to the *specific property* for which the rezoning is sought, and may not consist of generalities, *see Surkovich v. Doub, supra* at 272.

There was not one shred of evidence before the county commissioners, nor in the facts impermissibly considered by the trial court when it departed from the record, which supports a finding of "mistake" in the 1965 legislative action placing the subject property in the agricultural and conservation districts. The evidence is uncontradicted in showing that the area in which this property is located was completely rural in 1965, and remains substantially so today; and that the subject property consists partly of marshland. Far from having been a "mistake," the original zoning was the only logical course which the legislative body could have taken "at the time."

## II(a)

An effective argument made by appellants, in urging reversal, is that the rezoning cannot be sustained on the basis of a "change" in the character of the neighborhood if for no other reason than the applicant's failure to delineate the neighborhood in which it claims the substantial change occurred. *Rockville v. Henley, supra* at 473; *Mont. Co. v. Nat'l Capital Realty,* 267 Md. 364, 376, 297 A. 2d 675 (1972);

*Border v. Grooms,* 267 Md. 100, 110, 297 A. 2d 81 (1972). We said in *Border v. Grooms:*

> ". . . As the cited cases indicate, that which reasonably constitutes the neighborhood of the subject property is one of the basic facts to be established by an applicant for rezoning, and because of its fundamental involvement in any case resting on a contention of a change in the character of the neighborhood it must be satisfactorily shown upon the record. . . ." 267 Md. at 110.

Here, the applicant made no effort to meet this requirement in presenting its case to the county commissioners, nor did the latter make any finding of fact in this regard. The trial judge took two approaches in considering this question. At the conclusion of his opinion, he said:

> "That, from the evidence, and from a map of the geography of the area, it can easily be determined that the Board of County Commissioners for Worcester County was considering an area in close proximity of the Village of Newark, bordering on the shores of Chincoteague Bay, in close proximity, therefore, to the shores of the Assateague National Seashore, . . . ."

The dominant theme of his decision on this point, however, is that in Worcester County, it is unnecessary to delineate the neighborhood or, otherwise stated, that the entire county is the "neighborhood." His precise basis for this notion appears to be sections 20.11 and 20.12 of the Worcester County Zoning Ordinance. Those provisions merely provide for map amendments in "recognition of the fact that sections of Worcester County are changing from a rural to a residential, commercial, industrial, or other character . . . ." It is quite likely that most, if not all, zoning ordinances provide for anticipated growth and zoning changes.

Although, for purposes of this case, the applicant's failure to delineate the "neighborhood" is alone sufficient to

mandate reversal under our prior decisions, we are inclined to consider the "change" issue in light of appellants' suggestion of what, at the most, could constitute the "reasonable 'neighborhood.' " It is bounded by Route 113 on the west, the Bay on the east, Mason Landing Road on the north, and Cedartown Road on the south. Roughly, this comprises an area of some sixteen square miles and would barely include the Town of Newark, some two miles from the subject property, within the northwest corner of the "neighborhood."

We have said that the concept of a "neighborhood" is a flexible one and will vary according to the geographical location involved; it being axiomatic that in rural or semi-rural areas, as in the case at bar, the "neighborhood" will be larger and more fluid than in a city or suburban area, *Border v. Grooms, supra* at 109; *Prince George's Co. v. Prestwick,* 263 Md. 217, 226, 282 A. 2d 491 (1971); *Montgomery v. Bd. of Co. Comm'rs,* 263 Md. 1, 5, 280 A. 2d 901 (1971). By no stretch of the imagination, however, can this flexibility be so distorted as to include Ocean City and Ocean Pines, which are some 15 to 17 miles to the north of the subject property. What Judge Barnes said for the Court in *Clayman v. Prince George's Co.,* 266 Md. 409, 292 A. 2d 689 (1972) seems especially apposite here:

"Although what constitutes the neighborhood of a subject property for the purposes of applying the Maryland 'change-mistake' rule 'should not be precisely and rigidly defined, but may vary from case to case,' . . . nevertheless, the neighborhood in any area must be an area which *reasonably* constitutes the immediate environs of the subject property. . . . The rule requires that the 'neighborhood' must be the *immediate* neighborhood of the subject property, not some area miles away; . . . ." 266 Md. at 418 (emphasis in original).

Clearly, those areas were not within the "immediate neighborhood of the subject property."

Assuming a satisfactory delineation of the neighborhood, then, we turn finally to the question whether the applicant met its "onerous" burden of showing a substantial change in its character.

## II(b)

Although the county commissioners listed several "changes" on which they relied for granting the rezoning, in this Court appellees rely primarily on two of them: the availability of the Newark sewerage system and the establishment of Assateague Island as a National Seashore Park. Concededly, we have held that a "change" *may* occur where new or expanded sewer facilities are shown. *Montgomery v. Bd. of Co. Comm'rs, supra* at 7; *Finney v. Halle,* 241 Md. 224, 239, 216 A. 2d 530 (1966). *But cf. Clayman v. Prince George's Co., supra* at 419. The facts here, however, do not support the application of those decisions.

First, the Newark facility has been variously described as two to three miles from the subject property. Secondly, there is no evidence of any commitment or agreement by the Worcester County Sanitary District to extend the use of the Newark sewerage system to the applicant. This is borne out by the testimony of Calvin Burns, its principal witness, who, when asked "whether they [the Town of Newark] will approve of this type of plan, or have they been approached yet," replied, "I haven't approached the Town of Newark particularly." Indeed, his entire reference to the proposed use of the Newark facility was equivocal, to say the least, as this testimony indicates:

> "What I did say, we feel that *there may be* ways that we could send our effluent, our initial effluent for the first couple, three or four years, to the Town of Newark's plant that already exists, until we built our plant which we will be building." (emphasis added).

Appellees attempt to supply this critical omission in the record by the inclusion of a letter dated September 12, 1972, from the District Engineer addressed to Burns. It suggests

the possibility of an agreement between the applicant and the Worcester County Sanitary District, whereby the capacity of the Newark system would be expanded to serve the applicant's proposed development "for a limited period of time," in exchange for substantial financial considerations. The difficulty with the letter is that it was written some three months after the rezoning was approved, and was not even considered by the circuit court. As we have already stressed, in our review of a zoning decision we are confined to the record before the legislative body, *Aspen Hill Venture v. Mont. Co.; Montgomery Co. Coun. v. Kaslow,* both *supra,* except for such additional evidence as may have been received pursuant to Art. 66B, § 4.08 (b).

Moreover, there is no merit in the applicant's contention that a "change" occurred when Assateague Island became a National Seashore Park. The thrust of this tenuous argument is that the development which would have taken place on the island — were this not precluded by the prevailing federal controls — must now find its way to the mainland, especially at the site of the applicant's property. Assateague, of course, is some six miles across Chincoteague Bay from the subject property. It is some 25-30 miles by automobile which represents the only practical means of travel, since there are no docking facilities on the island opposite the subject property. Thus, Assateague Island clearly is not within the "neighborhood." What appellees have failed to recognize is that when we speak of "substantial changes in the character of the neighborhood," we mean "changes must occur in that immediate neighborhood of such a nature as to have *affected its character." Clayman v. Prince George's Co., supra* at 418 (emphasis in original).

A brief word is in order with respect to the remaining "changes" cited by the county commissioners. What we have already said concerning the "neighborhood" is dispositive of the applicant's reliance upon the development of Ocean City and Ocean Pines, many miles to the north. There is even less merit in the argument that the future improvement of State Route 113 is a "change," since there is nothing in the record

to indicate that this proposal was unknown to the legislative body which adopted the original zoning in 1965. Finally, the rezoning of some 100 acres in the Porter's Neck-Cropper's Island area does not meet the test either. Not only is it questionable whether that land, being some two miles away, is within the "neighborhood," but that rezoning fails in another respect. There, the property was rezoned from the agricultural and conservation districts to R-1 (rural residential). The latter requires minimum lot sizes of 20,000 square feet with a maximum density of two dwelling units per acre. In short, it is a less dense classification than any of those sought by the applicant. As such, it does not represent "a substantial change in the character of the neighborhood" when applied here.

Thus, there was insufficient evidence before the county commissioners to make fairly debatable the issue that a "substantial change" had occurred. In sum, therefore, the applicant failed to sustain the "onerous" burden which our countless decisions have fastened upon it.

*Judgment reversed; remanded for entry of an order reversing the decision of the County Commissioners of Worcester County; appellees to pay costs.*