558 A.2d 742

**Raymond E. RODRIGUEZ, et al.**

v.

**PRINCE GEORGE'S COUNTY, Maryland, et al.**

No. 1295, Sept. Term, 1988.

Court of Special Appeals of Maryland.

June 7, 1989.

538

Gary Alexander (Alexander & Cleaver, P.A., on the brief), Fort Washington, for appellants.

Russell W. Shipley (Meyers, Billingsley, Shipley, Curry, Rodbell & Rosenbaum, P.A., on the brief), Riverdale, for appellee, Ammendale.

Joyce Birkel Hope, Associate County Atty. (Michael P. Whalen, County Atty., on the brief), Upper Marlboro, for appellees, Prince George's County and the County Council.

Argued before GILBERT, C.J., and WILNER, and KARWACKI, JJ.

WILNER, Judge.

This appeal concerns the rezoning of a 186.2–acre tract of land in Prince George's County. The rezoning was approved by the County Council, sitting as the District Council, subject to certain specified conditions, and that action was affirmed by the Circuit Court for Prince George's County.

The property in question lies in the Beltsville area; it fronts on the west side of U.S. Route 1, about three miles north of the Capital Beltway. Known as the Ammendale Normal Institute, the property was used for many years by a religious order for the training of novitiates, but that use has ceased, and the buildings, some of which are included in the National Register of Historic Places, have fallen into disrepair. For purposes of this case, the property consists of three parcels: a 56.1–acre parcel fronting on U.S. Route 1; a 26.1–acre parcel, which forms the center part of the tract and contains most or all of the buildings; and a 104–acre parcel that was once used for sand and gravel mining and is largely undeveloped.

The first of these parcels was placed in the E–I–A (Employment—Institutional Areas) zone in 1976; the other two parcels have R–R (Rural—Residential) zoning. In December, 1985, an application was made to place the entire tract in the E–I–A zone. With the application was a Basic Plan proposing the development of 2.7 million square feet of institutional, service, office, and commercial facilities. Construction would take place in two stages, over a period of from six to 10 years.

(1) *The E–I–A Zone—Approval Process*

The E–I–A zone is a comprehensive design zone provided for in § 27–499 of the Prince George's County Code. The essential purpose of the zone seems to be to "[p]rovide for a mix of employment, institutional, retail, and office uses in a manner which will retain the dominant employment and institutional character of the area." § 27–499(a)(4).

Because the E–I–A zone is a comprehensive design zone, full approval of the development occurs in three stages:

First: approval by the District Council of a Basic Plan showing the kinds and amounts of proposed land uses as part of and as a precondition to approval of a zoning map amendment authorizing those land uses;

Second: approval by the Planning Board of a Comprehensive Design Plan showing the amounts and locations of the land uses and circulation systems and indicating the general schedule of development; and

Third: approval by the Planning Board of Specific Design Plans for each portion of the development to be constructed within a particular time period.

We are concerned here with the first of these three stages.

Section 27–499 sets out a number of standards or conditions which a Basic Plan must meet to qualify the property for E–I–A zoning. They are supplemented by other standards or conditions specified in § 27–195, dealing with map amendment approval of comprehensive design zones. Section 27–195(b) provides, in that regard, that:

"(1) Prior to the approval of the application and the Basic Plan, the applicant shall demonstrate to the satisfaction of the District Council that the entire development meets the following criteria:

(A) The proposed Basic Plan shall either conform to:

(i) The specific recommendation of a General Plan map, Area Master Plan map, or urban renewal plan map; including the principles and guidelines of the plan text which address the design and physical development of the property, the public facilities necessary to serve the proposed development, and the impact which the development may have on the environment and surrounding properties; or

(ii) The principles and guidelines described in the plan (including the text) with respect to land use, the number

of dwelling units, intensity of nonresidential buildings, and the location of land uses.

(B) The economic analysis submitted for a proposed retail commercial use shall adequately justify a use of the size and scope shown on the Basic Plan;

(C) Transportation facilities (including public streets and public transit) which are existing, under construction, or for which construction funds are contained in either the first six (6) years of the adopted County Capital Improvement Program or the first five (5) years of the adopted State Highway Administration Construction Program shall be adequate to carry anticipated traffic. The uses proposed shall not generate traffic which would lower the level of service anticipated by the land use and circulation systems shown on approved General or Area Master Plans, or urban renewal plans;

(D) Other existing or planned private and public facilities which are existing, under construction, or for which construction funds are contained in the first six (6) years of the adopted County Capital Improvement Program (such as schools, recreation areas, water and sewerage systems, libraries, and fire stations) shall be adequate for the uses proposed;

(E) Environmental relationships reflect compatibility between the proposed development and surrounding land uses, so as to promote the health, safety, and welfare of the present and future inhabitants of the Regional District; and CDZ applications filed after October 31, 1978.

(2) Notwithstanding Subparagraphs (C) and (D), above, where the application anticipates a construction schedule of more than six (6) years (Section 27–179), public facilities (existing or scheduled for construction within the first six (6) years) shall be adequate to serve the development proposed to occur within the first six (6) years. The Council shall also find that public facilities probably will be adequately supplied for the remainder of the project. In considering the probability of future public facilities construction the Council may consider such things as

existing plans for construction, budgetary constraints on providing public facilities, the public interest and public need for the particular development, the relationship of the development to public transportation, or any other matter that indicates that public a [sic] private funds will likely be expended for the necessary facilities."

Section 27–195(c)(1) authorizes the District Council, in approving a zoning map amendment, to

"impose reasonable requirements and safeguards (in the form of conditions) which it finds are necessary to either:

(A) Protect surrounding properties from the adverse effects which might accrue from the Zoning Map Amendment; or

(B) Further enhance the coordinated, harmonious, and systematic development of the Regional District."

Section 27–195(c)(2), however, provides that "[i]n no case shall the conditions waive or lessen the requirements of, or prohibit uses allowed in, the approved zone."

Finally, both State and county law require the District Council, in approving (or denying) a zoning map amendment over protest, to make specific findings of fact, in writing. Md.Ann.Code art. 28, § 8–123 states: "In Prince George's County, no application for a map amendment or special exception, which is contested, may be granted or denied except upon written findings of basic facts and written conclusions." Similarly, § 27–141 of the County Code requires a final decision of the Council in any zoning matter to be "supported by specific written findings of basic facts and conclusions."

### (2) *Procedural Background*

The instant application was first considered by the Technical Staff of the Maryland–National Capital Park and Planning Commission. In a report filed May 12, 1986, the Staff recommended that the application be denied. Among its findings of fact, the Staff stated:

"7. The subject property is affected by two Master Plans: the Adopted and Approved Master Plan for

Fairland–Beltsville and Vicinity (1968) and the Northwestern Area Plan (1975).

8. The Adopted and Approved Fairland–Beltsville Master Plan proposed R–90/R–80 one-family detached residential zone with a recreation center proposed for the center of the area.

9. The Northwestern Area Plan designates E–I–A zoning for the 56.1± acres adjacent to U.S. Route 1, public/quasi-public use for the Ammendale Normal Institute and suburban residential for the northwest portion of the subject property.

10. The Approved General Plan for Prince George's County (1982) identifies the eastern portion of the site as a 'Major Employment Area.'

11. Prior to approval of the Basic Plan, it must be demonstrated to the District Council that the proposed development is entirely compatible with this existing and proposed development of the surrounding area.

12. Both the Northwestern Area Plan and the Approved General Plan sets guidelines and policies for employment areas."

The "Determinations" of the Staff were as follows:

"1. The Basic Plan does not take the full development of the employment areas into account in forecasting the affect [sic] of the proposed use on roads and surrounding residential areas.

2. The proposed use would significantly increase the flow of traffic through neighboring residential areas.

3. The roads which will be in place in the vicinity of the proposed use will not be able to handle the amount of traffic which would be attracted to such use.

4. Transportation Systems Management techniques may make some additional E–I–A Zone development feasible.

5. With the addition of automatic fire extinguishing systems, the existing and programmed public facilities will be adequate.

6. The proposed development does not conform to guide-
lines set forth in the Northwestern Area Plan relating
to traffic impact of employment areas on residential
neighborhoods.

7. The proposed E–I–A Zone development is not consist-
ent with the recommendations of the Fairland–Belts-
ville Master Plan for suburban residential development
in the R–80/R–90 Zones."

In the concluding paragraphs of its Report, the Staff
opined that the road improvements proposed by the appli-
cant or planned by the State Highway Administration "are
not enough to adequately serve the proposed addition of
2,168,000 square feet of institutional, office and commercial
floor space." It was "unsure of how much additional
traffic can be accommodated by the roads in the area," and
it expressed concern about the diversion of traffic "through
the residential areas west and south of the subject proper-
ty" which "would have a negative impact on these resi-
dential areas."

The Planning Board reached a different conclusion. In a
Resolution adopted November 13, 1986, it recommended
approval of the application, subject to nine conditions relat-
ing principally to road improvements and the preservation
of trees and historic buildings. It made no detailed findings
of fact; indeed, aside from the conditions, the Resolution
says no more than that

"[T]he Planning Board disagreed with the analysis and
recommendation of the Technical Staff based on the fol-
lowing determinations:

1. The public/quasi-public use of the subject property
has been abandoned. The Northwestern Area Plan's
recommendation for a public/quasi-public use for a
portion of the subject property is therefore no longer
appropriate.

2. The proposed business park is compatible with exist-
ing and proposed development in the surrounding area.

3. Without proper controls, the traffic generated by the proposed use would exceed planned road capacities and result in unacceptable levels of service on roads in the area.

4. The proposed business park should be approved in phases which take into account future road improvements and the ability of area roads to accommodate additional traffic.

5. With the addition of automatic fire extinguishing systems in all buildings, the existing and programmed public facilities will be adequate."

The next stage in the process was a hearing before a Zoning Hearing Examiner. He arrived at a third recommendation—that the Council retain the E–I–A zoning for the 56.1–acre parcel, rezone the middle 26.1 acres to E–I–A, and retain the residential zoning on the balance (104 acres). The Examiner expressed two concerns over the rezoning of the 104 acres. First, he pointed out that the area was in a suburban community and was designed to remain residential in the two Master Plans to which it is subject. Second, he concluded that, even without this rezoning, by reason of other approved developments in the immediate vicinity, there was going to be "a major congestion problem at U.S. Rt. 1 and Powder Mill Road for a period of at least six years," and that, without some "mitigating affects [sic]", he could not find that "transportation facilities will be adequate to carry anticipated traffic."

The District Council, of course, had before it all of these reports and recommendations when it met, in April, 1987, to consider the matter. The arguments made to the Council focused on three considerations: compatibility of the proposed development with the neighboring residential communities; the traffic problems likely to be caused or exacerbated by the development; and, to a lesser extent, the apparent statutory requirement that the proposed land uses be consistent with existing master plans. After listening to argument, the Council initially continued the hearing, without making a decision, for 30 days, to allow the two sides an

opportunity to try to resolve their differences through the development of "covenants" that would limit the uses to which the property could be put.

On June 4, 1987—four days before the District Council's scheduled reconvening on the matter—the applicant informed the Council that it had met with the protestants to explore the possibility of entering into covenants "to exclude undesirable E–I–A uses" and that the protestants were "not willing to enter into any covenants whatsoever with the applicant." It therefore proposed "to fulfill the District Council's intentions" by voluntarily amending its Basic Plan to exclude certain uses otherwise expressly permitted in the E–I–A zone. Attached to its letter as an appendix was a proposed revision of the Basic Plan eliminating 15 categories of use. Aware of the strictures set forth in § 27–195(c)(2), the applicant hastened to assure the council that

"this is not an offer on the applicant's part to have the Council conditionally zone the property, nor the proffer of additional evidence, but simply a designation by our Basic Plan that we are binding ourselves to limit or lessen that which would be otherwise permissible to the E–I–A zone. In this manner, it is hoped that the Council's April 27, 1987 wishes are fulfilled without any violations of the Prince George's County Zoning Ordinance. Further, this letter is intended to be in response to the dictate of the Council's motion of April 27, 1987."

This amendment was apparently filed pursuant to § 27–181 of the county code, dealing with requests to amend an application. In relevant part, that section allows an applicant to request an amendment to an application at any time if the amendment concerns "an error, omission of fact, or other factual change not mentioned below in this Section...." The two changes "mentioned below" were amendments that change the total area or configuration of the property and those changing the requested zoning classification, for both of which special conditions apply.

When the District Council reconvened on June 8, it regarded the Basic Plan as having been amended as requested by the applicant. After some further discussion, a motion was made to approve the application, as amended, subject to the conditions specified by the Planning Board. That motion failed. Several additional conditions were then proposed and approved, the two major ones being to require the development to proceed over a 10–year period, limited to 20 acres/year, and to preclude nearly all development within the 100–year flood plain without further approval by the Council. With those additional conditions, a motion to approve the application was adopted.

The written decision of the Council, embodied in the Zoning Ordinance adopted by it, recited, in skeletal fashion, the procedural history of the application. The heart of the decision was in three "WHEREAS" clauses and in the 11 conditions imposed. There were no specific findings of fact stated in the ordinance. All that was said in that regard was:

"WHEREAS, having reviewed the record in this case, the District Council has determined that the subject property should be rezoned to the E–I–A Zone; and

WHEREAS, in order to protect adjacent properties and the surrounding neighborhood, the rezoning herein is granted with conditions; and

WHEREAS, as the basis for this action, the District Council adopts the recommendations of the Planning Board as its findings and conclusions in this case.

NOW, THEREFORE, BE IT ORDAINED AND ENACTED: [that the application is approved subject to the enumerated conditions]."

The applicant subsequently agreed formally to the conditions imposed by the Council, whereupon the Council adopted a final Resolution incorporating those conditions.

In the circuit court, the opponents complained, as they complain here, that the District Council failed to make detailed findings of basic facts and conclusions as required

by law, that its action was in violation of the existing area master plans, that its action was not based upon substantial evidence that the proposed land uses were compatible with existing uses in the surrounding areas, and that the approval by the Council of the Basic Plan *as amended*—i.e., with some 15 permitted uses deleted—constituted an unlawful conditional zoning. The court rejected these arguments, concluding that (1) by adopting the Planning Board's recommendations as its own findings, the Council "ma[d]e the basis of their decision sufficiently clear," (2) there was sufficient evidence in the record to make the Council's decision fairly debatable, and (3) the Council's action did not constitute an unlawful conditional zoning.

### (3) *Summary of Our Conclusions*

We think that the court (and the Council) erred in at least two respects. We do not believe that the District Council's blanket adoption of the Planning Board's recommendations sufficed to comply with the clear requirements of art. 28, § 8–123 of the State Code or § 27–141 of the County Code. Nor do we believe that the clear proscription of § 27–195(c)(2) can be circumvented by the artifice of simply amending the Basic Plan to exclude uses that the Council finds, or might find, objectionable but which are expressly permitted in the E–I–A zone.

### (4) *Statement of Findings*

In *Montgomery v. Bd. of Co. Comm'rs*, 256 Md. 597, 261 A.2d 447 (1970), the Court was faced with a circumstance almost identical to that now before us. The District Council for Prince George's County approved a zoning map change, adopting as its findings the recommendations of the Technical Staff of the Planning Board. The Technical Staff Report, however, made no specific findings as to the definition of the neighborhood, what changes had occurred since the last comprehensive rezoning, or whether any such changes resulted in a change in the character of the neighborhood. It simply concluded that the new zone was in conformance with the area plan and that a proposed arterial highway, when completed, should alleviate any traffic problems.

The Court of Appeals, citing the statutory requirement that the District Council make "the necessary findings and conclusions and . . . express them in writing," concluded that the Council had failed to make those findings and thus remanded the case "for compliance with the mandatory requirement of the statute." 256 Md. at 603, 261 A.2d 447. In that regard, it noted, also at 603, 261 A.2d 447:

> "At the argument, counsel for the District Council indicated that the practice of the District Council in ruling on rezoning applications in which it agreed with the recommendations of the Planning Board or of the Technical Staff, as the case might be, was to adopt the findings in the report or recommendations relied upon rather than to make specific findings in the order of the District Council, itself. *Although this is not a practice to be encouraged, we are not prepared to rule, as a matter of law, that the District Council may not, in a specific case, comply with the statutory requirement to make written findings of basic facts and conclusions by incorporating into its order specific findings of basic facts and conclusions of either the Planning Board or of the Technical Staff by specific reference to those findings.* However, in the instant case it is clear that neither the Planning Board nor the Technical Staff made any such findings of the necessary basic facts or conclusions."

(Emphasis added.)

■ Although the issues here are not "change" or "mistake," as they were in *Montgomery*, the same principle applies. If, despite the Court's editorial comment, the Council wishes to continue the practice of incorporating or adopting by reference the findings of others as its own findings and conclusions, it must at least make certain that the findings it proposes to adopt comply with the statutory requirements of specificity. Here, as in *Montgomery*, they do not; and therein lies the problem.

As we observed, §§ 27–195(b)(1) and 27–499 set forth certain requirements that a Basic Plan must meet in order

to qualify the property for E–I–A zoning. Among those requirements are that (1) the Basic Plan conform either to the specific recommendations of the existing area plans or to the "principles and guidelines" described in those plans, (2) transportation facilities, existing, under construction, or funded for construction within a 5–6 year period, be adequate, (3) the proposed uses not generate traffic that would lower the level of service anticipated in existing area plans, and (4) there be compatibility between the proposed development and surrounding land uses.

■ Whether these or other required conditions are met depends on a host of subsidiary findings. It is not permissible for the Council, or any administrative body, simply to parrot general statutory requirements or rest on broad conclusory statements. As stated in *Turner v. Hammond,* 270 Md. 41, 56, 310 A.2d 543 (1973), "citizens are entitled to something more than boiler-plate resolution." *See also Redden v. Montgomery County,* 270 Md. 668, 685, 313 A.2d 481 (1974), and cases cited therein; *Ocean Hideaway Condo. v. Boardwalk Plaza,* 68 Md.App. 650, 515 A.2d 485 (1986).

■ We have quoted in full the "determinations" of the Planning Board that the District Council adopted as its findings and conclusions. They do not suffice—they do not even begin to suffice—as "specific written findings of basic facts and conclusions." To the extent that they even address the statutory requirements for an E–I–A zone, they are wholly conclusory and take no account whatever of the specific concerns and issues raised by the parties, the Technical Staff, or the Zoning Hearing Examiner. The area plans appear to call for the land within the 104–acre parcel to remain residential; if the myriad of uses permitted in the E–I–A zone are consistent with those plans or the "principles" of those plans, as §§ 27–499 and 27–195(b) seem to require, the Council has not informed us, or anyone else, how that is so. If, unlike the technical staff or the zoning hearing examiner, the Council believed that, with the condi-

tions imposed by it, existing or anticipated traffic and transportation facilities will be adequate to handle the increased traffic from the proposed development, it has not explained the basis upon which it reached that conclusion. In short, the District Council is going to have to do a better job of it.

Whether the evidence in the record suffices to support a rezoning of the tract, or any part of the tract, depends, of course, on the specific findings of fact and conclusions underlying the zoning decision. Until those findings are made and clearly articulated, therefore, we cannot properly address that issue. *Compare Floyd v. County Council of P.G. Co.*, 55 Md.App. 246, 461 A.2d 76 (1983).

### (5) *Conditional Zoning*

"Conditional zoning," we said in *Bd. of Co. Comm'rs v. H. Manny Holtz, Inc.*, 65 Md.App. 574, 579, 501 A.2d 489 (1985) (quoting in part from Miller, *The Current Status of Conditional Zoning*, Institute on Planning, Zoning & Eminent Domain 122 (1974)), "is a zoning reclassification subject to conditions not generally applicable to land similarly zoned. '[W]hen an area of land is rezoned from one classification to another, and such change is not outright but subject to some type of conditions, then we are confronted with a conditional zoning problem.' "

The early view of most courts was that conditional (or, as it is sometimes called, "contract") zoning was unlawful *per se*. As noted in *Baylis v. City of Baltimore*, 219 Md. 164, 170, 148 A.2d 429 (1959), there seemed to be three chief reasons for this view:

"that rezoning based on offers or agreements with the owners disrupts the basic plan, and thus is subversive of the public policy reflected in the overall legislation, that the resulting 'contract' is nugatory because a municipality is not able to make agreements which inhibit its police powers, and that restrictions in a particular zone should not be left to extrinsic evidence."

*See also* 1 P. Rohan, *Zoning and Land Use Controls* § 5.02[1] (1989); 2 A. and D. Rathkopf, *The Law of Zoning and Planning* § 27.05 (1989).

For some or all of these reasons, Maryland very clearly adopted this jaundiced view of conditional zoning, first in *Wakefield v. Kraft,* 202 Md. 136, 96 A.2d 27 (1953) and later in *Baylis;* and, while a number of commentators have urged a relaxation of this approach in favor of the flexibility allowed by conditional zoning, so far Maryland has continued to find the practice objectionable, at least in the absence of clear statutory authorization. In *Mont. Co. v. Nat'l Capital Realty,* 267 Md. 364, 373, 297 A.2d 675 (1972), the Court declared that "[t]he invalidity of conditional zoning in Maryland is not seriously open to question." *See also City of Baltimore v. Crane,* 277 Md. 198, 205–06, 352 A.2d 786 (1976); *Bd. of Co. Comm'rs v. H. Manny Holtz, supra,* 65 Md.App. 574, 501 A.2d 489.

This general proscription against conditional zoning may, of course, be relaxed by statute, and, indeed, it has been to some extent. *See, for example,* Md.Ann.Code art. 66B, § 4.01(b), applicable to non-charter counties. Section 27–195(c)(1) of the Prince George's County Code constitutes a similar kind of relaxation; it permits a limited scope of conditional zoning—generally of the type permitted by art. 66B, § 4.01(b). But § 27–195(c)(2) makes explicit what, in *H. Manny Holtz* we found implicit in § 4.01—that this limited authority does *not* allow conditions that prohibit specific uses otherwise permitted in the approved zone.

Section 27–195(c)(2) seemingly addresses one of the concerns about conditional zoning not clearly articulated in *Baylis,* but which we alluded to in *H. Manny Holtz*—that it is inconsistent with the principle that, while zoning regulations may vary from one district or classification to another, within a district or classification they should be uniform. Conditional zoning tends to destroy that uniformity; it subjects some land within a district or classification to restrictions that are not applicable to other land within the same district or classification and thus tends to create

unique mini-districts not provided for in the general zoning ordinance.

To some extent, of course, this dis-uniformity may be achieved in other ways—through variances, special exceptions, and, increasingly, through floating or general development zones, such as the E–I–A zone at issue here, and the site plan review process that governs development in those zones. But, in terms of *use* restriction, those appear to be the only methods authorized; permitted uses cannot be excluded by contract with the zoning authority as part of the basic rezoning.

■ The extent to which this specific prohibition can be circumvented by private agreement is very limited. Although there appears to be no impediment to an applicant entering into private covenants with other parties to lessen their opposition to an application, or to garner their support for it, such offerings cannot be made to the legislative body authorized to grant or deny the application. This was made clear in *Mont. Co. v. Nat'l Capital Realty, supra,* 267 Md. 364, 297 A.2d 675. There too the applicant, faced with substantial opposition, offered to enter into certain covenants restricting the use of the property to those shown on an attached site plan, contingent on approval of the application. The Court saw that for the obvious subterfuge that it was. At 373, 297 A.2d 675, it stated:

"We think it clear that the covenants, coupled with the site plan attached thereto, if adopted as a basis for the requested reclassification, would have produced a form of conditional zoning.... Had the Council then granted the application on the strength of the covenants, ... it would have committed what we believe would have been a classic illustration of conditional zoning."

The form here was slightly different—an amendment to the Basic Plan—but the effect was precisely the same. The applicant was offering a deal to the District Council: in order to induce the Council to approve its application for reclassification, the applicant would agree in advance to

exclude from the scope of the approval certain uses expressly permitted in the approved zone. Whatever the general right of the applicant to amend the Basic Plan may be, that right cannot be exercised in such manner as to violate the clear restrictions of § 27–195(c)(2). We think that what occurred here was no different in either purpose or effect from what was done, and condemned, in *Nat'l Capital Realty*. Quite apart from the District Council's failure to articulate specific findings and conclusions, its action was invalid for this reason as well.

### (6) *Conclusion*

As we indicated briefly above, it may well be that the evidence of record can support a decision to reclassify all or part of the land to an E–I–A zone. But such a decision must be made without regard to improper conditions and the Council will have to comply with the requirements of Md.Ann.Code art. 28, § 8–123 and Prince George's County Code, § 27–141.

JUDGMENT REVERSED; CASE REMANDED TO CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY WITH INSTRUCTIONS TO VACATE ORDER OF DISTRICT COUNCIL AND REMAND TO DISTRICT COUNCIL FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS TO BE PAID BY APPELLEES.